No. 26-1575

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

REACH COMMUNITY DEVELOPMENT, et al.,

Plaintiffs-Appellees,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the District of Oregon

_____

**MOTION FOR A STAY PENDING APPEAL
AND AN IMMEDIATE ADMINISTRATIVE STAY**

_____

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
AUGUST FLENTJE
BRENNA H. SCULLY
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 880-6114*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ...................................................................................... i

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ............................................................................................... 1

STATEMENT ...................................................................................................... 4

ARGUMENT ....................................................................................................... 7

    I.  Plaintiffs' Substantive Due Process Claim Is Meritless. ...................... 7

        A.  Plaintiffs Do Not Show A Cognizable Deprivation Under The Fifth Amendment ................................................................................ 7

        B.  Plaintiffs Do Not Establish A New Fundamental Right ......................... 10

        C.  Plaintiffs Do Not Show Government Conduct That Shocks The Conscience ................................................................................ 13

    II.  The Injunction Is Unworkable And Overbroad. ................................. 15

    III. The Remaining Stay Factors Decisively Favor The Government ................... 20

    IV. The Court Should Stay District Court Proceedings Until The Government's Appeal Is Resolved ................................................................................ 21

CONCLUSION ................................................................................................. 22

CERTIFICATE OF COMPLIANCE ..................................................................... 23

# TABLE OF AUTHORITIES

**Cases:**                                                         **Page(s)**

*Agent Orange Prod. Liab. Litig., In re*
475 F. Supp. 928 (E.D.N.Y. 1979) .................................................................. 12

*Baker v. McCollan,*
443 U.S. 137 (1979) ....................................................................................... 9

*Barnes v. Felix,*
605 U.S. 73 (2025) ........................................................................................ 17

*Board of the Cnty. Comm'rs of Bryan Cnty. v. Brown,*
520 U.S. 397 (1997) ...................................................................................... 14

*Chicago Headline Club v. Noem,*
--- F.4th ----, No. 25-3023, 2026 WL 622677 (7th Cir. Mar. 5, 2026) .............. 1, 18-19

*Collins v. City of Harker Heights,*
503 U.S. 115 (1992) ..................................................................................8, 9-10

*Coshow v. City of Escondido,*
34 Cal. Rptr. 3d 19 (Ct. App. 2005) ..........................................................11-12

*County of Sacramento v. Lewis,*
523 U.S. 833 (1988) ...................................................................................9, 13

*Cruzan ex rel. Cruzan v. Director, Mo. Dep't of Health,*
497 U.S. 261 (1990) ...................................................................................... 11

*Daniels v. Williams,*
474 U.S. 327 (1986) .................................................................................... 2, 9

*Davidson v. Cannon,*
474 U.S. 344 (1986) ....................................................................................... 8

*Estelle v. Gamble,*
429 U.S. 97 (1976) ......................................................................................... 9

*Foli v. Metropolitan Water Dist. of S. Cal.,*
592 F. App'x 634 (9th Cir. 2015) ................................................................... 11

*Fraihat v. U.S. Immigr. & Customs Enf't*,
16 F.4th 613 (9th Cir. 2021) ........................................................................ 14

*Friends of the Everglades, Inc. v. Secretary of the U.S. Dep't of Homeland Sec.*,
No. 25-12873, 2025 WL 2598567 (11th Cir. Sep. 4, 2025) .......................... 21

*Gasper v. Louisiana Stadium & Exposition Dist.*,
418 F. Supp. 716 (E.D. La. 1976), *aff'd per curiam*,
577 F.2d 897 (5th Cir. 1978) ........................................................................ 12

*Graham v. Connor*,
490 U.S. 386 (1989) ...................................................................................... 16

*Guertin v. Michigan*,
912 F.3d 907 (6th Cir. 2019) ........................................................................ 12

*International Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*,
389 U.S. 64 (1967) ........................................................................................ 17

*Kachatryan v. Blinken*,
4 F.4th 841 (9th Cir. 2021) ........................................................................... 10

*Kingsley v. Hendrickson*,
576 U.S. 389 (2015) ........................................................................................ 2

*Michigan Dep't of State Police v. Sitz*,
496 U.S. 444 (1990) ...................................................................................... 19

*Newsom v. Trump*,
141 F.4th 1032 (9th Cir. 2025) ..................................................................... 20

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................................ 7

*North Carolina v. Covington*,
581 U.S. 486 (2017) ...................................................................................... 15

*O'Bannon v. Town Ct. Nursing Ctr.*,
447 U.S. 773 (1980) ................................................................................ 2, 7, 8

*Patel v. Kent Sch. Dist.*,
648 F.3d 965 (9th Cir. 2011) ........................................................................ 14

*Puente v. City of Phoenix*,
    123 F.4th 1035 (9th Cir. 2024) ................................................................. 3, 13

*Regino v. Staley*,
    133 F.4th 951 (9th Cir. 2025) ....................................................................... 9, 10

*Riggins v. Nevada*,
    504 U.S. 127 (1992) .......................................................................................... 11, 12

*Rochin v. California*,
    342 U.S. 165 (1952) ................................................................................................ 11

*Tanner v. Armco Steel Corp.*,
    340 F. Supp. 532 (S.D. Tex. 1972) ................................................................ 12

*Tincher v. Noem*,
    164 F.4th 1097 (8th Cir. 2026) ................................................... 1, 16, 19, 20

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................................................ 19

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ............................................................................................... 20

*Union Pac. Ry. Co. v. Botsford*,
    141 U.S. 250 (1891) ............................................................................................... 11

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ................................................................... 3, 10, 11, 13

*Winston v. Lee*,
    470 U.S. 753 (1985) ............................................................................................... 11

**Statutes:**

6 U.S.C. § 202 ............................................................................................................. 4

6 U.S.C. § 211(c)(8) ................................................................................................. 4

6 U.S.C. § 252(a)(3) ................................................................................................. 4

8 U.S.C. § 1103(a)(5) ............................................................................................... 4

iv

28 U.S.C. § 2680 ........................................................................................ 3

40 U.S.C. § 1315 ........................................................................................ 4

**Other Authorities:**

Memorandum from Alejandro N. Mayorkas, Sec'y, U.S. DHS,
   to Agency Leaders (Feb. 6, 2023), https://perma.cc/K996-RNFR ...................4-5, 17

Order, *Los Angeles Press Club v. Noem*,
   No. 25-5975 (9th Cir. Dec. 18, 2025), Dkt. No. 66 ....................................................... 1

## INTRODUCTION

The government respectfully requests a stay of the district court's preliminary injunction pending appeal and an immediate administrative stay pending resolution of this motion.

Yet again, a district court has issued a sweeping preliminary injunction that effectively prohibits federal law-enforcement officers from deploying nonlethal crowd-control devices (like tear gas) to disperse violent, disruptive, or unlawful protests. The courts of appeals, including this Court, have repeatedly stayed those prior injunctions. *See Chicago Headline Club v. Noem*, --- F.4th ----, No. 25-3023, 2026 WL 622677 (7th Cir. Mar. 5, 2026) (per curiam); *Tincher v. Noem*, 164 F.4th 1097 (8th Cir. 2026) (per curiam); Order, *Los Angeles Press Club v. Noem*, No. 25-5975 (9th Cir. Dec. 18, 2025), Dkt.66. This Court's intervention is required here as well.

The injunction in this case is even more extraordinary than its predecessors because, unlike those cases, "this case is not about the rights of protesters." Dkt.75, at 4. Rather, plaintiffs live in, own, and operate Gray's Landing, an apartment complex located near a U.S. Immigration and Customs Enforcement (ICE) facility in Portland, Oregon. Since June 2025, U.S. Department of Homeland Security (DHS) officers at that facility have on occasion deployed chemical irritants to disperse violent, disruptive, or unlawful protests. Plaintiffs claim that, as the chemical irritants dissipate, they waft through the air into the apartment complex. This, plaintiffs say,

1

violates their purported substantive due process right of bodily integrity free from nonconsensual exposure to toxic airborne substances.

At most, that is a standard nuisance claim masquerading as a constitutional claim: due process "does not apply to the indirect adverse effects of governmental action." *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 789 (1980). Confirming as much, plaintiffs identify no precedent recognizing their novel and expansive substantive due process theory. Yet the district court endorsed their constitutional claim to preliminarily enjoin federal officers from using chemical irritants "in quantities . . . likely to reach Gray's Landing" unless "necessary to address an imminent threat to life." Dkt.75, at 57. The Supreme Court has repeatedly instructed that the Constitution "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels v. Williams*, 474 U.S. 327, 332 (1986). In defiance of that maxim, the district court's "tender-hearted desire to tortify the [Constitution]," *Kingsley v. Hendrickson*, 576 U.S. 389, 408 (2015) (Scalia, J., dissenting), improperly transformed a prototypical nuisance claim into a constitutional violation.

The government is likely to succeed on appeal because plaintiffs' constitutional claim—that substantive due process prohibits law-enforcement officers from deploying chemical irritants near homes—lacks any basis in law. Incidental effects of government action directed at third-party protestors do not implicate plaintiffs' Fifth Amendment rights at all. The district court's reasoning would categorically prohibit

2

law-enforcement officers from using an essential nonlethal crowd-dispersal tool if the aerosolized chemicals could affect people nearby. That is contrary to this Court's caselaw permitting the use of chemical irritants and recognizing their critical role in deescalating dangerous situations. *See, e.g.*, *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024). Plaintiffs' asserted right of bodily integrity free from nonconsensual exposure to toxic airborne substances is not "deeply rooted in this Nation's history and tradition," *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotation marks omitted); indeed, plaintiffs identify no court that has endorsed such an open-ended theory of substantive due process. And the use of chemical irritants to disperse violent, disruptive, or unlawful protests does not shock the conscience based solely on the mere possibility that, as aerosolized chemicals dissipate, they will incidentally impact people nearby. Plaintiffs' claims sound in tort, not the Constitution; their remedy, if any, is to file a tort claim against the United States, subject to the limitations of the Federal Tort Claims Act. *See* 28 U.S.C. § 2680.

The injunction should independently be stayed because it exceeds the district court's equitable and constitutional powers. Its vague terms require federal officers to guess the court's view of whether, based on a host of environmental factors, the total "quantities" of chemical irritants that they—and all other officers on the scene— deploy "are likely to reach Gray's Landing" and whether using chemical irritants is "necessary to address an imminent threat to life," all during violent, disruptive, or unlawful protests. Dkt.75, at 57. And it subjects federal officers to contempt

3

proceedings for using reasonable force to protect themselves and the public from violent and unlawful conduct. The injunction, quite literally, puts federal officers at the mercy of the wind. The order is also overbroad because it prohibits chemical irritants even in situations where their use would not shock the conscience and, therefore, would not violate plaintiffs' purported Fifth Amendment rights.

Finally, the injunction irreparably injures the government and public interest. By limiting which nonlethal crowd-control devices federal officers may use to disperse violent, disruptive, or unlawful protests on pain of contempt, the injunction endangers officers and public safety, superintends officers' conduct, encroaches on the Executive's prerogative to enforce the law, and violates fundamental separation-of-powers principles.

## STATEMENT

**A.** Congress empowered DHS to "control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). U.S. Customs and Border Protection and ICE are components within DHS charged with, among other things, enforcing and administering federal immigration laws. *See, e.g.*, 6 U.S.C. §§ 202, 211(c)(8), 252(a)(3). The Federal Protective Service is the law-enforcement component within DHS charged with protecting federal facilities and persons therein. *See* 40 U.S.C. § 1315; Dkt.57-1, at 1.

DHS policy permits officers to use "the level of force that is objectively reasonable in light of the facts and circumstances confronting the [law-enforcement

4

officer] at the time force is applied." Memorandum from Alejandro N. Mayorkas, Sec'y, U.S. DHS, to Agency Leaders 2 (Feb. 6, 2023), https://perma.cc/K996-RNFR (DHS Policy) (emphasis omitted). DHS policy authorizes officers to deploy several types of nonlethal chemical irritants. Dkt.57-1, at 9-11; Dkt.57-2, at 2-4; Dkt.75, at 3 n.1. Chemical irritants generally result in fewer injuries than other crowd-control mechanisms, because they allow federal officers to avoid physical confrontation with suspects and protestors. Dkt.57-1, at 10-11; Dkt.57-2, at 7.

**B.** Beginning in June 2025, violent, disruptive, and unlawful protests have occurred near an ICE facility in Portland. *See* Dkt.75, at 12-25. As the district court acknowledged, protestors have posed "a number of threats to federal officers and federal property." Dkt.75, at 40-41. Protestors have "[engaged in] conduct designed to interfere with officers doing their jobs," "trespassed on federal property," "impeded ingress and egress into the ICE Facility," "brandished weapons," and "assaulted officers." Dkt.75, at 41; *see also* Dkt.57-1, at 2-9; Dkt.57-2, at 3-7. On occasion, federal officers have responded to such conduct by deploying crowd-dispersal tools, including chemical irritants. Dkt.75, at 12-25, 12 n.12.

**C.** This case relates to alleged downwind impacts from federal officers' use of chemical irritants to disperse such protests. Dkt.75, at 3. Plaintiffs are residents of and entities that own and operate Gray's Landing, an apartment complex near the ICE facility. Dkt.75, at 4. They allege that when DHS officers deploy chemical irritants to disperse violent, disruptive, or unlawful protests near the ICE facility,

aerosolized chemicals frequently waft through the air into Gray's Landing, violating their Fifth Amendment substantive due process rights and the Fourth Amendment. Dkt.45, at 2-3, 37-46. Plaintiffs sought a preliminary injunction prohibiting defendants from deploying chemical irritants that are likely to "infiltrate" Gray's Landing. Dkt.46, at 1.

On March 6, the district court entered a preliminary injunction prohibiting federal officers from "using chemical munitions in quantities such that the aerosolized chemicals discharged from said munitions are likely to reach Gray's Landing . . . unless it is determined to be necessary to address an imminent threat to life." Dkt.75, at 57. The court found that plaintiffs are likely to succeed on the merits of their Fifth Amendment substantive due process claim,[1] which alleges that federal officers' use of nonlethal chemical irritants to disperse violent, disruptive, or unlawful protestors near the ICE facility implicates a fundamental "right to bodily integrity free from the nonconsensual exposure and ingestion of toxic airborne substances in the form of chemical munitions that have been intentionally, repeatedly, and excessively deployed by Defendants [against third-party protestors] over the past several months and that enter Plaintiffs' homes so as to harm their health." Dkt.75, at 33. That conduct, the

---

[1] The district court found that plaintiffs are unlikely to succeed on their Fourth Amendment claim and declined to reach plaintiffs' additional Fifth Amendment theories. Dkt.75, at 29-30, 30 n.19.

court determined, shocks the conscience because officers were deliberately indifferent to the risk of harm to plaintiffs.

The district court denied the government's request to stay the injunction pending appeal. Dkt.57, at 48; Dkt.75, at 54-56.

## ARGUMENT

The government is entitled to a stay pending appeal of the preliminary injunction because the government is likely to succeed on the merits, it will suffer irreparable harm absent a stay, and the balance of the equities and public interest favor a stay. *See Nken v. Holder*, 556 U.S. 418, 425-26 (2009).

## I. Plaintiffs' Substantive Due Process Claim Is Meritless.

The government is likely to succeed on the merits. Plaintiffs' novel and expansive substantive due process theory—that the Constitution forbids law-enforcement officers from using chemical irritants to disperse violent, disruptive, or unlawful protests near homes because of a possibility that nearby residents may be affected as the aerosolized chemicals dissipate—is baseless. This Court should stay the injunction and clarify that the Constitution plays no role in this, at most, tortious dispute.

### A. Plaintiffs Do Not Show A Cognizable Deprivation Under The Fifth Amendment.

Plaintiffs' Fifth Amendment claim is likely to fail because due process "does not apply to the indirect adverse effects of governmental action." *O'Bannon v. Town*

7

*Ct. Nursing Ctr.*, 447 U.S. 773, 789 (1980). There is a "simple distinction between government action that directly affects a citizen's legal rights, or imposes a direct restraint on his liberty, and action that is directed against a third party and affects the citizen only indirectly or incidentally." *Id.* at 788. The latter does not constitute a "deprivation of an interest in life, liberty, or property," *id.* at 787, because "the due process provision of the Fifth Amendment does not apply to the indirect adverse effects of governmental action," *id.* at 789. Thus, that a government action "may lead to severe hardship" for plaintiffs "does not turn the [action] into a governmental decision to impose that harm" on plaintiffs. *Id.*; *see also id.* at 784 (holding that decision to decertify skilled-nursing facility did not deprive the facility's residents of liberty).

*O'Bannon* forecloses plaintiffs' Fifth Amendment claim here. Incidental effects from dissipating aerosolized chemical irritants deployed against third-party protestors do not constitute a deprivation of plaintiffs' liberty. The district court wrongly disregarded *O'Bannon* as a procedural due process case. Dkt.75, at 35-36. For both substantive and procedural due process claims, "the Fourteenth Amendment does not require a remedy when there has been no 'deprivation' of a protected interest." *Davidson v. Cannon*, 474 U.S. 344, 348 (1986). And *O'Bannon*'s conclusion makes good sense in the substantive-due-process context, where courts are "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of*

8

*Harker Heights*, 503 U.S. 115, 125 (1992). The court's ruling vastly expands substantive due process to include incidental harms from otherwise lawful and constitutional government action. Under the court's order, the Constitution would be violated every time law-enforcement officers deploy chemical irritants near homes— even if that force is reasonable and necessary to protect officers and public safety— because it is possible that residents may be affected as the aerosolized chemicals dissipate.

To be sure, plaintiffs have alleged suffering physical discomfort. At most, however, that harm could give rise to tort claims, not constitutional claims. "[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1988). Nor does it "supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels v. Williams*, 474 U.S. 327, 332 (1986). Just as "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," *Estelle v. Gamble*, 429 U.S. 97, 106 (1976), and "false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official," *Baker v. McCollan*, 443 U.S. 137, 146 (1979), a nuisance does not become a substantive due process violation merely because the actor is the government.

### B. Plaintiffs Do Not Establish A New Fundamental Right.

"Substantive due process protects individuals from state action that interferes with fundamental rights." *Regino v. Staley*, 133 F.4th 951, 959-60 (9th Cir. 2025). Courts must "exercise the utmost care whenever . . . asked to break new ground in this field." *Collins*, 503 U.S. at 125. Thus, to establish a new fundamental right, a plaintiff must provide "a 'careful description' of the asserted fundamental liberty interest" and "[w]ith that careful description in mind," prove that "the asserted interest is 'objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed.'" *Regino*, 133 F.4th at 960 (second alteration in original) (first quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997); and then quoting *Kachatryan v. Blinken*, 4 F.4th 841, 858 (9th Cir. 2021)).

The district court flouted these well-established limits on substantive due process to find a new fundamental "right to bodily integrity free from the nonconsensual exposure and ingestion of toxic airborne substances in the form of chemical munitions that have been intentionally, repeatedly, and excessively deployed by Defendants over the past several months and that enter Plaintiffs' homes so as to harm their health." Dkt.75, at 32-33.

Neither plaintiffs nor the district court identify any history or tradition supporting the court's newfound fundamental right. In fact, the court itself admitted that this right "has not been found" before. Dkt.75, at 32. That alone should be

dispositive of plaintiffs' claims; at a minimum, it counsels decisively against the conclusion that plaintiffs are likely to prevail on the merits as to be entitled to the extraordinary remedy of a preliminary injunction.

To compensate for the absence of any historical tradition for plaintiffs' right, the district court wrongly invoked Supreme Court cases recognizing a different fundamental right, that of bodily integrity free from nonconsensual medical procedures and treatment. *See, e.g.*, *Cruzan ex rel. Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 280-87 (1990) (nonconsensual life-sustaining artificial feeding and hydration); *Winston v. Lee*, 470 U.S. 753, 759 (1985) (nonconsensual surgery); *Rochin v. California*, 342 U.S. 165, 172 (1952) (forcible stomach pumping); *Riggins v. Nevada*, 504 U.S. 127, 134-35 (1992) (forcible medication); *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891) (nonconsensual surgical examination). As the Supreme Court explained, this right is based on "the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment" and is "not simply deduced from abstract concepts of personal autonomy." *Glucksberg*, 521 U.S. at 725. The court ignored this key principle of substantive due process by focusing on an abstract concept of "bodily integrity" instead of the history and tradition of "the asserted right" itself. *Id.* at 723.

Recognizing the historical backdrop, this Court held that there is no fundamental right of bodily integrity free from nonconsensual exposure to fluoridated public drinking water because that "is not the type of invasive medical procedure that

11

implicates the constitutional right to refuse medication." *Foli v. Metropolitan Water Dist. of S. Cal.*, 592 F. App'x 634, 635 (9th Cir. 2015); *see also Coshow v. City of Escondido*, 34 Cal. Rptr. 3d 19, 31 (Ct. App. 2005) (same).[2] The district court brushed aside *Coshow* on the ground that fluoride has beneficial effects while chemical irritants do not. Dkt.75, at 37. But both harmful and beneficial medical treatment constitutes medical battery—the historical basis for the fundamental right of bodily integrity free from nonconsensual medical treatment. *See Riggins*, 504 U.S. at 134-35.

Courts around the country have similarly rejected claims proposing fundamental rights of bodily integrity free from nonconsensual exposure to airborne contaminants. *See, e.g.*, *Tanner v. Armco Steel Corp.*, 340 F. Supp. 532, 536 (S.D. Tex. 1972); *Gasper v. Louisiana Stadium & Exposition Dist.*, 418 F. Supp. 716, 721 (E.D. La. 1976), *aff'd per curiam*, 577 F.2d 897, 898-99 (5th Cir. 1978); *In re Agent Orange Prod. Liab. Litig.*, 475 F. Supp. 928, 934 (E.D.N.Y. 1979). The district court ignored these cases because government actors had not emitted the airborne contaminants. Dkt.75, at 36-37. But those cases explicitly acknowledge the more fundamental point that there is no constitutional right to be free from nonconsensual exposure to airborne

---

[2] Given this Court's holding in *Foli*, the district court mistakenly relied on *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019), which recognized a fundamental right of bodily integrity free from intentionally contaminated public drinking water. *Foli* rejected such a right. Regardless, *Guertin* does not apply here because it explained that the contamination was analogous to nonconsensual medical treatment. *Id.* at 920-22. Chemical irritants deployed as a crowd-control technique on third-party protestors bear no similarity to experimental medications given unknowingly to nearby residents.

contaminants, which, at the very least, illustrates that plaintiffs' purported right is not "deeply rooted in this Nation's history and tradition." *Glucksberg*, 521 U.S. at 721 (quotation marks omitted).

### C. Plaintiffs Do Not Show Government Conduct That Shocks The Conscience.

Plaintiffs' Fifth Amendment claim is unlikely to succeed for the independent reason that they cannot show that federal officers' use of chemical irritants was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8.

Use of chemical irritants "'shocks the conscience' only if the officer[s] acted with 'a purpose to harm [the plaintiff] for reasons unrelated to legitimate law enforcement objectives,'" like crowd dispersal and protection of themselves or others. *Puente v. City of Phoenix*, 123 F.4th 1035, 1055 (9th Cir. 2024) (second alteration in original). Here, plaintiffs fall far short of showing defendants acted with a "purpose to harm" because federal officers deployed chemical irritants to disperse violent, disruptive, or unlawful protests. Dkt.75, at 12-25, 40-41, 47.

The district court incorrectly applied the deliberate indifference standard. Dkt.75, at 40. As this Court has held, deliberate indifference is not the correct standard to determine whether officers' use of pepper spray shocks the conscience in situations "that escalated quickly, requiring officers to respond promptly without the

13

luxury of having time to make unhurried judgments." *Puente*, 123 F.4th at 1055-56 (citation modified).

Even if the deliberate indifference standard applied, that "stringent standard of fault" is not shown here, *Board of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997), because the district court made no findings as to whether any officers "recognize[d] an unreasonable risk and actually intend[ed] to expose the plaintiff[s] to such risks without regard to the consequences to the plaintiff[s]," *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011) (citation modified). Instead, the court inferred deliberate indifference based on "the *quantity* of chemical munitions and their *distance* of impact away from the Portland ICE Facility[.]" Dkt.75, at 42; *see also* Dkt.75, at 44-48. Yet the court neither determined what constitutes too much or too far, nor found that any officer knew what those thresholds were or that they were crossed in any given instance. The court's analysis is thus wholly detached from the deliberate indifference inquiry.

Compounding that error, the district court improperly placed the burden on the government to justify the amount of and location where chemical irritants were used. Dkt.75, at 42, 44-47. But it is plaintiffs' burden to prove deliberate indifference, and, as just explained, they fail to shoulder that burden. *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636 (9th Cir. 2021). The court baselessly found that officers' use of chemical irritants was contrary to DHS policy. Dkt.75, at 43. As the court recognized, that policy permits officers to use chemical irritants when

14

"[r]easonable consideration has been given to any factors which may counsel against the use of such force," and the court made no findings that officers did not reasonably consider those factors. *Id.* (citation modified). Finally, whether certain officers and defendants were told that plaintiffs had been harmed does not show that the officers who subsequently used chemical irritants knew that information or, under the court's reasoning, recognized that the amount and location posed a risk of similar harm to plaintiffs. Dkt.75, at 43-44.

## II. The Injunction Is Unworkable And Overbroad.

The injunction's defects are underscored by the district court's failure to account for "what is workable," as foundational principles of equity demand. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam) (quotation marks omitted). As a result, the order aggrandizes the court's power over Executive decision-making, transgressing the separation of powers.

**A.** The injunction is practically unworkable because it requires federal officers to determine whether its hopelessly vague terms apply as they face violent, disruptive, or unlawful protests. The order prohibits only "chemical munitions in quantities such that the aerosolized chemicals discharged . . . are likely to reach Gray's Landing." Dkt.75, at 57. But the district court provided no guidance on how much is too much and how close is too close. That equation is left as an exercise to the federal officer responding to dangerous conduct under threat of contempt.

15

This complex calculation must include not only the amount of chemical irritants that the officer himself deploys but also the amounts all other officers on the scene may elect to deploy. It must account for wind direction, wind speed, each officer's distance from Gray's Landing, as well as a host of other environmental factors that could increase the likelihood that chemical irritants reach Gray's Landing. In addition to computing this probability on the spot, officers must decide if they face "an imminent threat to life," which would permit using chemical irritants, or an imminent threat of bodily harm, which would not. In short, the injunction requires officers to have an intuitive sense of particle concentration, a mastery of meteorology, and an internal probability calculator—all while making "split-second judgments[ ]in circumstances that are tense, uncertain, and rapidly evolving," *Graham v. Connor*, 490 U.S. 386, 396-97 (1989), and upon pain of contempt for guessing wrong; *see also Tincher v. Noem*, 164 F.4th 1097, 1099-100 (8th Cir. 2026) (per curiam) (holding "injunction is too vague" where it "requires federal agents to predict what the district court would consider" triggers the injunction's restrictions and "[a] wrong call could end in contempt").

It is also entirely unclear how defendants are supposed to interpret the injunction's ambiguous exception, which permits chemical irritants when "necessary to address an imminent threat to life." Dkt.75, at 57. Perhaps the exception means that the use of chemical irritants in such circumstances does not violate plaintiffs' purported fundamental right. But, if that is true, then the district court erred by not

16

considering the nature of the threats facing officers each time they deployed chemical irritants as part of its evaluation of plaintiffs' Fifth Amendment claim.

Injecting still more uncertainty, the injunction prohibits federal officers' use of chemical irritants in situations that would be permitted by DHS policy: when "objectively reasonable in light of the facts and circumstances confronting the [officer] at the time force is applied." DHS Policy 2; *see also* Dkt.57-1, at 9-11; Dkt.57-2, at 2-4. By imposing additional considerations outside of DHS policy, the injunction adds complexity to already dynamic situations, further endangering officers and public safety amid violent, disruptive, or unlawful protests.

The ultimate impact of these vague constraints is the risk that federal officers will be held in contempt for violating a court order with ill-defined contours. "The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one." *International Longshoremen's Ass'n, Loc. 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). That danger is especially pronounced here, where officers must make split-second determinations in dangerous, fast-moving situations as to what the injunction's terms mean and whether they are satisfied. *See Barnes v. Felix*, 605 U.S. 73, 87 (2025) (Kavanaugh, J., concurring) ("What should the officer do . . . ? There are no easy or risk-free answers. Every feasible option poses some potential danger . . . . And an officer in that situation must make a split-second choice among those various dangerous options.").

**B.**     The injunction is also unworkable because it effectively prohibits DHS officers from deploying chemical irritants—even if objectively reasonable and necessary to protect officer and public safety—if they could possibly affect Gray's Landing.  And it grounds that prohibition in the Constitution, rendering the use of chemical irritants (no matter how justified) a violation of substantive due process if a plaintiff could be exposed to dissipating chemicals.

Eliminating federal law-enforcement officers' ability to use such "key tools for deterring escalation before threats become imminent" is nonsensical and may result in more dangerous confrontations.  Dkt.57-1, at 11.  Chemical irritants are "an intermediate force option to temporarily incapacitate a subject" and "used in situations where empty-hand techniques are not sufficient . . . but where deadly force is not deemed justified."  Dkt.57-1 at 9.  They allow law-enforcement officers to "safely mitigate . . . volatile situations without resorting to the use of further physical force or deadly force."  Dkt.57-2, at 7.  The injunction's prohibition thus "greatly increases the risk of injury to both officers and protesters, as physical confrontations are more likely to result in accidental harm, escalation, or use of higher levels of force."  Dkt.57-1, at 10; *see also* Dkt.57-2, at 7.

**C.**     Nor may the district court superintend officers' day-to-day decisionmaking.  Orders of this kind "impermissibly infringe[] on separation of powers principles" by "effectively establish[ing] the district court as the supervisor" of the Executive Branch's law-enforcement activities.  *Chicago Headline Club v. Noem*, ---

18

F.4th ----, No. 25-3023, 2026 WL 622677, at *5 (7th Cir. Mar. 5, 2026) (per curiam); *see also Tincher*, 164 F.4th at 1100.

It is the role of the Executive, under the direction of the President, not the federal courts, to oversee the execution of the laws. Article III does not "transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453-54 (1990); *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021) ("Federal courts do not possess a roving commission to . . . . exercise general legal oversight of the . . . Executive Branch[]."). Yet that is precisely what the injunction purports to do.

**D.**     What is more, the injunction is impermissibly overbroad. As explained, use of chemical irritants to disperse violent, disruptive, or unlawful protests does not violate plaintiffs' purported Fifth Amendment rights because that conduct does not shock the conscience. *See supra* Section I.B.3. The district court improperly raised that standard by prohibiting officers from using chemical irritants unless they face an imminent threat to life. Because the order restricts chemical irritants in situations that would not shock the conscience, it goes beyond the protections afforded by the Fifth Amendment and the harm alleged by plaintiffs. Instead, the court grafted the Fourth Amendment standard for reasonable *deadly* force onto a Fifth Amendment claim concerning *nonlethal* crowd-control measures, highlighting the mismatch between the claimed harm and the remedy.

19

### III. The Remaining Stay Factors Decisively Favor The Government.

The Court should stay the injunction because the government and public interest will be irreparably injured absent a stay. The district court has effectively banned the use of chemical irritants to disperse violent, disruptive, or unlawful protests near the ICE facility and, by threatening contempt for violations of its hopelessly vague restrictions, assumed day-to-day oversight of the Executive's responses to those protests. By itself, that violation of the separation of powers constitutes an irreparable harm to the Executive Branch. *See Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025). It is also an improper constraint on federal officers' ability to respond to protests that threaten officers, public safety, and federal property as well as the Executive's ability to enforce federal law. *See Tincher*, 164 F.4th at 1100 ("Most critically, to the extent the injunction's breadth and vagueness cause federal agents to hesitate in performing their lawful duties, it threatens to irreparably harm the government and undermine the public interest." (citation modified)). Thus, "[b]oth irreparable harm and the public interest weigh in favor of Defendants, who have an uncontested interest in the protection of federal agents and property and the faithful execution of law." *Newsom v. Trump*, 141 F.4th 1032, 1054 (9th Cir. 2025) (per curiam).

By contrast, plaintiffs fail to establish a likelihood of success on their constitutional claim, much less irreparable harm. Even under plaintiffs' theory, they will experience a constitutional violation only if a speculative chain of possibilities

20

aligns: federal officers deploy chemical irritants to disperse a violent, disruptive, or unlawful protest near the ICE facility; prevailing environmental conditions (like wind speed and direction) cause the aerosolized chemicals to waft into Gray's Landing; and those chemicals affect plaintiffs in such a way that shocks the conscience. The equities thus sharply favor the government.

## IV. The Court Should Stay District Court Proceedings Until The Government's Appeal Is Resolved.

The government respectfully requests that the Court stay proceedings below until the merits of the government's appeal are decided. *See Friends of the Everglades, Inc. v. Secretary of the U.S. Dep't of Homeland Sec.*, No. 25-12873, 2025 WL 2598567, at *13 (11th Cir. Sep. 4, 2025) (granting the government's motion to stay preliminary injunction pending appeal and staying "further merits proceedings below until resolution of [the] appeal"). Allowing discovery to go forward would impose enormous costs on DHS given the number of DHS officers who may be involved and the extended period over which the protests occurred. But a holding on whether plaintiffs have shown a deprivation or substantive due process right that is cognizable under the Fifth Amendment or whether plaintiffs' exposure to aerosolized chemicals "shocks the conscience" would significantly narrow the scope of whatever discovery may be warranted. Accordingly, staying district court proceedings until this Court supplies further guidance on plaintiffs' dubious legal theories would maximize judicial economy.

21

## CONCLUSION

The Court should stay the preliminary injunction pending appeal and should grant an immediate administrative stay pending consideration of this motion.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
AUGUST FLENTJE
 /s/ *Brenna H. Scully*
BRENNA H. SCULLY
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 880-6114*
*Brenna.scully@usdoj.gov*

MARCH 2026

22

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,155 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Brenna H. Scully*
Brenna H. Scully