No. 26-1575

# In the United States Court of Appeals for the Ninth Circuit

REACH COMMUNITY DEVELOPMENT, *et al.*,

*Plaintiffs-Appellees,*

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

*Defendants-Appellants.*

On Appeal from the U.S. District Court for the District of Oregon
D. Or. Case No. 3:25-cv-2257 (Baggio, J.)

## BRIEF FOR APPELLEES

Brian D. Netter
Jeffrey B. Dubner
Anna L. Deffebach
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043

Katie Schwartzmann
PROTECT DEMOCRACY
201 St. Charles Ave., Suite 114
New Orleans, LA 70170

Taylor Jaszewski
BRADLEY BERNSTEIN SANDS LLP
1212 Broadway, Suite 1100
Oakland, CA 94612

Daniel F. Jacobson
Lynn D. Eisenberg
Stephen K. Wirth
Brian C. Rosen-Shaud
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave., NW, Suite 301
Washington, DC 20016
(301) 615-2336
dan@jacobsonlawyersgroup.com

Darin M. Sands
Colin Hunter
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Suite 204
Portland, OR 97209

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ii

INTRODUCTION ........................................................................1

STATEMENT OF THE CASE ........................................................5

SUMMARY OF ARGUMENT........................................................28

ARGUMENT ...............................................................................31

I.   Plaintiffs Are Likely to Succeed on the Merits ...............................31

    A.   Plaintiffs have standing. ..................................................32

    B.   Plaintiffs are likely to succeed on their substantive due process claim.............................................................35

        1.   The applicable inquiry is whether DHS's invasion of Plaintiffs' liberty interest in bodily integrity shocks the conscience. ..................................................36

        2.   Plaintiffs assert a fundamental right regardless.......................42

        3.   Plaintiffs may challenge the deprivation of their rights regardless of whether they are intended targets. ..................48

        4.   DHS acted with time to deliberate. ...........................................50

        5.   DHS's deliberate indifference to Plaintiffs' harms shocks the conscience. ................................................54

II.  Plaintiffs Have Suffered, and Will Continue to Suffer, Grievous Bodily Harm Absent an Injunction ................................63

III. The District Court Did Not Abuse Its Discretion in Crafting Relief......70

IV. The Equities and the Public Interest Favor Plaintiffs............................74

CONCLUSION.............................................................................75

FORM 8 CERTIFICATE OF COMPLIANCE

i

# TABLE OF AUTHORITIES

**Cases**             Page(s)

*Albright v. Oliver,*
510 U.S. 266 (1994) ............................................................ 42

*Baker v. McCollan,*
443 U.S. 137 (1979) ............................................................ 50

*Bowers v. Whitman,*
671 F.3d 905 (9th Cir. 2012) .............................................. 40

*Califano v. Yamasaki,*
442 U.S. 682 (1979) ............................................................ 73

*City of L.A. v. Lyons,*
461 U.S. 95 (1983) ....................................................... 32, 35

*Costanich v. Dep't of Soc. & Health Servs.,*
627 F.3d 1101 (9th Cir. 2010) ............................................ 38

*County of Sacramento v. Lewis,*
523 U.S. 833 (1998) ..................................................... passim

*Cruzan by Cruzan v. Dir., Mo. Dep't of Health,*
497 U.S. 261 (1990) ............................................................ 43

*Estate of Soakai v. Abdelaziz,*
137 F.4th 969 (9th Cir. 2025) ................................... 30, 39, 49

*Estelle v. Gamble,*
429 U.S. 97 (1976) .............................................................. 50

*Foli v. Metro. Water Dist. of S. Cal.,*
592 F. App'x 634 (9th Cir. 2015) ........................................ 47

*Guertin v. Michigan,*
912 F.3d 907 (6th Cir. 2019) ......................................... 44, 49

*Index Newspapers LLC v. U.S. Marshals Serv.,*
977 F.3d 817 (9th Cir. 2020) ........................... 32, 35, 74, 75

*Ingraham v. Wright,*
430 U.S. 651 (1977) ............................................................ 43

*Johnson v. Meltzer,*
134 F.3d 1393 (9th Cir. 1998) ............................................ 43

ii

*Lemire v. California Dep't of Corrections,*
726 F.3d 1062 (9th Cir. 2013) ................................................................39

*Martinez v. City of Oxnard,*
337 F.3d 1091 (9th Cir. 2003) ...............................................................37

*Melendres v. Arpaio,*
695 F.3d 990 (9th Cir. 2012) .................................................................63

*Mirabelli v. Bonta,*
146 S. Ct. 797 (2026) ..............................................................................46

*Nicholson v. City of L.A.,*
935 F.3d 685 (9th Cir. 2019) ................................................39, 42, 44

*Nunez v. City of L.A.,*
147 F.3d 867 (9th Cir. 1998) .................................................................37

*O'Bannon v. Town Ct. Nursing Center,*
447 U.S. 773 (1980) ...............................................................................48

*Obergefell v. Hodges,*
576 U.S. 644 (2015) ...............................................................................46

*P.B. v. Koch,*
96 F.3d 1298 (9th Cir. 1996) .........................................................42, 44

*Pauluk v. Savage,*
836 F.3d 1117 (9th Cir. 2016) .......................................................41, 44

*Plumeau v. Sch. Dist. No. 40,*
130 F.3d 432 (9th Cir. 1997) .........................................................42, 44

*Polanco v. Diaz,*
76 F.4th 918 (9th Cir. 2023) ....................................................41, 44, 49

*Puente v. City of Phoenix,*
123 F.4th 1035 (9th Cir. 2024) .............................................................53

*Regino v. Staley,*
133 F.4th 951 (9th Cir. 2025) ................................................28, 36, 45

*Resnick v. Hayes,*
213 F.3d 443 (9th Cir. 2000) .................................................................37

*Riggins v. Nevada,*
504 U.S. 127 (1992) .........................................................................41, 43

iii

*Rochin v. California,*
  342 U.S. 165 (1952) ................................................................41, 43

*Smith v. Albany County Sch. Dist. No. 1 Bd. of Trs.,*
  __ F.4th __, 2026 WL 1205777 (10th Cir. May 4, 2026) ................................39

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014) ................................................................32

*Thomas v. County of L.A.,*
  978 F.2d 504 (9th Cir. 1992) ................................................................32

*Union Pac. Ry. Co. v. Botsford,*
  141 U.S. 250 (1891) ................................................................43

*United States v. Grey,*
  959 F.3d 1166 (9th Cir. 2020) ................................................................31

*United States v. Salerno,*
  481 U.S. 739 (1987) ................................................................37

*Vazquez v. County of Kern,*
  949 F.3d 1153 (9th Cir. 2020) ................................................................39, 41, 44

*Washington v. Glucksberg,*
  521 U.S. 702 (1997) ................................................................*passim*

*Washington v. Housing Authority of the City of Columbia,*
  58 F.4th 170 (4th Cir. 2023) ................................................................45

*Whitley v. Albers,*
  475 U.S. 312 (1986) ................................................................53

*Wilkinson v. Torres,*
  610 F.3d 546 (9th Cir. 2010) ................................................................51

## Other Authorities

Timothy M. Tymkovich et al., *A Workable Substantive Due Process,*
  95 Notre Dame L. Rev. 1961 (2020) ................................................................39

## INTRODUCTION

For eight months, federal officers at an Immigration and Customs Enforcement (ICE) facility in Portland deployed tear gas canisters, pepperballs, and other chemical munitions in response to non-violent protests outside the facility. The officers did not confine their deployments to protecting officers within the facility or the property itself. Contrary to the policies of the Federal Protective Service (FPS), officers of other Department of Homeland Security (DHS) components have frequently ventured far from the ICE facility in deploying huge quantities of tear gas, often releasing them in the middle of the street immediately outside Gray's Landing, an affordable-housing complex located nearby. These non-FPS officers have also routinely launched long-range tear-gas and other chemical-munition canisters from the ICE facility directly toward Gray's Landing, shattering apartment windows, landing in the building's courtyard where children play, and releasing gas that consistently floods into Gray's Landing and saturates apartments.

Plaintiffs—including small children, elderly veterans, domestic violence survivors, and residents with serious medical conditions—suffered and will continue to suffer grievous injuries: acute respiratory distress, chemical burns, chronic coughing, heart palpitations, and severe PTSD episodes. One

1

Plaintiff had to have an adrenal gland surgically removed because the gas exacerbated her Cushing's disease. Children who were healthy before now have to take daily medication. Plaintiffs have been forced to sleep wearing gas masks, in bathtubs, and in closets to survive in their own homes. They are trapped in this literally toxic environment; most simply cannot afford to move.

After an evidentiary hearing involving 15 witnesses (five who testified live) and over 100 exhibits—including extensive video evidence that the government did not dispute—the district court issued a 57-page opinion making detailed findings that DHS routinely released massive quantities of tear gas immediately adjacent to Gray's Landing without justification, knew its deployments were harming residents, and did not care. The district court entered a narrow preliminary injunction: DHS may not deploy chemical munitions in quantities likely to reach Gray's Landing, unless necessary to address an imminent threat to life. The injunction does not affect the protective activities of FPS at all under its current policies, nor does it prevent DHS from using various chemical munitions on or near ICE property that cannot reach Gray's Landing from that location. It prevents DHS from continually saturating a residential building with poison gas.

That tailored preliminary injunction should be affirmed. The district court's factual findings—which the government does not challenge as clearly erroneous—establish each element of Plaintiffs' substantive due process claim: DHS invaded Plaintiffs' well-established liberty interest in bodily integrity by knowingly releasing toxic chemicals into their homes and bodies; DHS acted with ample time to deliberate, both across an eight-month campaign of recurring deployments and during individual incidents; and DHS's conduct shocks the conscience, because DHS continued deploying massive quantities of tear gas adjacent to Gray's Landing despite repeated, documented notice that it was causing serious harm. Most damning, the government has not disputed that DHS repeatedly created large plumes of tear gas immediately outside of Gray's Landing for the purpose of generating propaganda videos, including two that DHS posted to its Instagram account.

Contrary to the holding of the stay panel in this case and the government's arguments now, Plaintiffs need not define a new, anti-tear-gas-specific fundamental right under the framework of *Washington v. Glucksberg*, 521 U.S. 702 (1997). The shocks-the-conscience standard, not the fundamental-right test, applies to substantive-due-process challenges to executive conduct. And even if Plaintiffs did need to assert a fundamental right, the Supreme

3

Court and this Court have long held that the right against the non-consensual introduction of substances into a person's body is a fundamental right cognizable under the Due Process Clause.

Plaintiffs are thus likely to succeed on the merits, and their showing of irreparable harm is overwhelming. Plaintiffs have suffered undisputed, horrific physical and psychological injuries due to DHS's conduct. Judgment after trial cannot remedy the toxic chemicals that children, the elderly, people with pre-existing conditions, and other innocent residents will be forced to breathe in their own homes, for months or years, absent a preliminary injunction.

The injunction is also narrowly tailored and workable in practice. DHS's own declarations establish that its officers understand the impact ranges of each type of chemical munition they deploy. And the Federal Protective Service—the agency primarily responsible for protecting the ICE facility— should not be affected by the injunction whatsoever, because it already confines its chemical-munitions use to the facility and its immediate vicinity and does not use tear gas at all.

The Court should affirm the preliminary injunction.

4

## STATEMENT OF THE CASE

This case does not involve, as the government repeatedly insists, the mere "downwind" impacts of chemical munitions that "waft in the wind" after DHS agents deploy the munitions purportedly for crowd-control purposes. Br. 14; *see id.* at 2, 10, 12–13, 19, 31, 38–39. This case involves DHS agents continuously deploying tear gas and other chemical munitions—over and over again—within *feet* of Plaintiffs' residential apartments, despite knowing that the gas is infiltrating the apartments and severely harming residents. Officers have deployed toxic chemicals in this manner even when facing little to no threat to federal property or personnel, including instances where DHS *undisputedly* has deployed tear gas immediately outside Plaintiffs' apartments solely to create social media propaganda. And the victims of DHS's actions are among the most vulnerable members of society: Plaintiffs include small children, the elderly, people with pre-existing medical conditions, and domestic violence survivors with PTSD, all of whom have suffered horrific injuries from the tear gas and other chemicals routinely entering their homes and bodies.

These facts were established and found by the district court below based on a voluminous record, which included hours of videos documenting DHS's

5

actions. The record below includes testimony from 15 witnesses, including five for Plaintiffs who testified live at an evidentiary hearing, 72 exhibits that Plaintiffs introduced into evidence (among them numerous videos and photographs), and hundreds of pages of DHS incident reports.[1]

The government did not present any live witnesses or video evidence at the evidentiary hearing below and did not dispute the accuracy of any of Plaintiffs' testimony or evidence. The sole documentary evidence the government introduced was the DHS incident reports, which were unsworn and in some cases the district court found were contradicted by Plaintiffs' videos. The facts below were established on this voluminous record.

**1.** Plaintiffs include twelve residents of Gray's Landing, an affordable-housing complex in Portland. ER-006, ER-010–11. All residents must have incomes below a certain threshold, 42 apartments are reserved for veterans, and there are numerous children, disabled persons, and senior citizens who live in the complex. 1-SER-092.

Gray's Landing sits kitty-corner from the Portland ICE facility, at the intersection of S. Moody Avenue and Bancroft Street. The southwest corner

---

[1] Plaintiffs' video exhibits (except Exhibit 19) are available at https://www. youtube.com/playlist?list=PLZZGlWOJfMoKqIGj57J_TvLfam5rak5aN. Exhibit 19 is available at https://youtu.be/NQtm5LATz_o.

of Gray's Landing, where several Plaintiffs live, is closest to the ICE facility, less than 100 feet away. Gray's Landing has an outdoor, U-shaped courtyard that many apartments overlook. The below image shows an aerial view of the ICE facility, Gray's Landing, and where each resident Plaintiff resides.



The Portland ICE facility has been the scene of protests against the federal government since at least early June 2025. Protesters generally congregate near the north driveway to the ICE facility, on Bancroft Street, and continue down Bancroft Street running east, directly in front of the south

7

side of Gray's Landing. The protests occurred nearly every day during the summer of 2025, and although protest sizes have ebbed and flowed since, significant crowds have consistently gathered in connection with political rallies and in response to current events. For example, protests swelled in the first weeks of October 2025 after the President announced he would be deploying the National Guard to Portland, and there have been large protests on nationwide "No Kings" rally days. Large protests near the ICE facility also occurred daily following the shooting of Alex Pretti in Minnesota in January 2026.

Although the protests are often loud and crowded, they have been overwhelmingly non-violent since June 2025.[2] Nevertheless, from June 2025 to February 2026, federal officers repeatedly and indiscriminately deployed tear-gas canisters, smoke grenades, pepperballs, and other chemical munitions in the face of protests—often irrespective of protest size or the actions of the protesters. 1-SER-054 ¶ 6, 1-SER-054 ¶ 11; 1-SER-058 ¶ 4; 1-SER-003 ¶ 4; 1-SER-061 ¶ 4; 1-SER-066 ¶ 4.

---

[2] *See* Findings of Fact & Conclusions of Law at 29–30, *Oregon v. Trump*, No. 3:25-cv-1756-IM (D. Or. Nov. 7, 2025), ECF No. 146.

Indeed, Plaintiffs have witnessed—and in some cases videotaped—the moments when federal officers begin using tear gas and other chemical munitions on a given night. These Plaintiffs uniformly attest, and their video evidence shows, that officers have regularly used tear gas, smoke grenades, and pepperballs in response to little to no provocation. *See* 1-SER-054 ¶ 6; 1-SER-058 ¶ 4; 1-SER-003 ¶ 4; 1-SER-061 ¶¶ 3, 4; 1-SER-066 ¶ 4; 1-SER-072 ¶ 17; 1-SER-132; Ex. 19.[3] Officers have used the chemical munitions on occasions when as few as a dozen protesters were present, 1-SER-066 ¶ 4, solely because a protester walked close to, or stuck a toe over, a blue line at the end of the ICE facility's driveway, 1-SER-054 ¶ 6, or when protesters were simply chanting loudly or using profanity, 1-SER-066 ¶ 4.

The district court described over two dozen incidents when DHS officers deployed chemical munitions during the relevant eight-month period, ER-014–27 & n.12, and Plaintiffs testified that there were even more deployments, 2-SER-246:6–14, 2-SER-296:4–11. DHS used tear gas and other chemical munitions next to Gray's Landing several times a week during the summer and October of 2025. 1-SER-011 ¶ 8; 1-SER-055 ¶ 10; 1-SER-061 ¶ 4. And in late January to early February 2026, officers used mass volumes of tear gas

---

[3] https://www.youtube.com/watch?v=NQtm5LATz_o

more than ten times—on five different days—across an eight-day span. ER-014 & n.12.

DHS has not limited its use of chemical munitions to clearing the driveway to the ICE facility or otherwise dispersing crowds impeding access to the ICE property. The district court found that, at times, DHS officers walked a block or more away from the ICE facility, circling Gray's Landing, and released the chemical munitions from the streets there. ER-017–18, ER-044–45; Ex. 19.[4] Many other times, officers have fired projectile chemical munitions from the street and upper levels of the ICE building using long-range "launchers," shooting directly toward Gray's Landing. Chemical munitions fired in this manner have shattered Gray's Landing apartment windows, ER-024, ER-049; Ex. 58,[5] landed in the Gray's Landing courtyard where children play, ER-044–45, and come to rest immediately next to residents' units. ER-016, ER-026; Exs. 1, 56.[6]

Two Plaintiffs testified at the evidentiary hearing that the below images, which they took respectively from a Gray's Landing apartment and its

---

[4] https://youtu.be/NQtm5LATz_o

[5] https://youtu.be/f3uUEfJ779U

[6] https://www.youtube.com/playlist?list=PLZZGlWOJfMoKqIGj57J_TvLfam5rak5aN

10

courtyard, reflected the typical saturation of tear gas on Bancroft Street immediately outside Gray's Landing when DHS used gas during this eight-month period. Ex. 5 at 0:01; Ex. 37 at 2:38.[7]





---

[7] https://www.youtube.com/playlist?list=PLZZGlWOJfMoKqIGj57J_TvLfam5rak5aN

DHS has released large quantities of chemical munitions outside of Gray's Landing *knowing* that they were severely harming Plaintiffs and other residents and occupants of the complex. An employee of the property manager approached DHS officers in early July to inform them that the tear gas and chemicals were harming her and others who lived and worked at Gray's Landing. 1-SER-082 ¶ 5. The officers laughed at her. *Id.* They told her derisively that she must have allergies because the gases they used were "environmentally friendly." *Id.*

The harms to Gray's Landing residents from DHS's use of chemical munitions were also widely reported, including through news reports, a lawsuit brought by a Gray's Landing resident in August that described the "near-nightly toxic environment" created by federal officers' use of tear gas and smoke, 1-SER-156, and even from a letter from members of Congress to Secretary Noem, 1-SER-161.

DHS, moreover, knew of the harms to Plaintiffs in particular when this lawsuit was filed on December 5, 2025, and when Plaintiffs moved for a preliminary injunction with supporting declarations detailing the harms to Plaintiffs on December 29, 2025. ER-036–37. And yet, DHS continued to deploy massive amounts of tear gas and other chemical munitions next to

12

Gray's Landing, including on five days over an eight-day span starting in late January 2026.

**2.** DHS knowingly exposed Plaintiffs to these harms not only where there was no imminent threat to federal personnel or property, but also in some instances for the sole purpose of creating political propaganda. That fact was undisputed below and is undisputed here.

On September 27, President Trump announced that he was "directing Secretary of War, Pete Hegseth, to deploy all necessary Troops to protect War ravaged Portland." 1-SER-100. Several days later, the President painted Portland in apocalyptic terms.[8] In the weeks that immediately followed, DHS hosted and gave rooftop access to a number of "influencers" to photograph and film the purported chaos outside the ICE facility, in what Defendants do not deny was an effort to create propaganda to support the President's assertions.

The images below show just a few of the many examples of influencers filming from the top of the ICE facility during this time period.

---

[8] Chantelle Lee, *Trump Says Portland Is 'War Ravaged.' Here's What to Know About Crime in the City*, TIME (Sept. 30, 2025), https://perma.cc/Y8Y5-DCWG.





On top of the roof at Portland ICE with @hunnybadgermom! 🤍



[9]

---

[9] Dkt. 46-3, Ex. 24.

14



The head of the CBP deployment in Portland, Timothy Sullivan, acknowledged being in the picture above standing next to influencer Nick Sortor on the day that then-DHS Secretary Noem visited the facility. 2-SER-371:6–372:1.

The influencers were also invited to stand behind federal officers at street level. For instance, on October 4, 2025, Plaintiff Rebecca Roe witnessed influencers standing outside the ICE facility behind the police line, including Ben Bergquam.

---

[10] Dkt. 46-3, Ex. 23.



[11]

The same day, Bergquam posted a video from in front of the ICE facility: "Happening now at the Portland ICE facility! Multiple arrests, tear gas and the fight to save our country! God Bless ICE! God Bless America!" 1-SER-146.[12] The next day, Bergquam posted a video showing tear gas in the street outside of Gray's Landing and the ICE facility, writing "I could watch this one over and over!" 1-SER-148.[13]

DHS officers substantially increased their use of tear gas, smoke grenades, and other chemical munitions during this time, and they used these munitions in unusual ways.[14] During the afternoon of October 4, 2025, for

---

[11] Ex. 7 at 0:13, https://youtu.be/TIHD9y6sKFM.

[12] https://x.com/BenBergquam/status/1974616980960530643

[13] https://x.com/BenBergquam/status/1974970052345790595

[14] *See* Erik Neumann, *Right-wing Influencers Shape Nation and Trump's Understanding of Portland Protests*, Or. Pub. Broad. (Oct. 13, 2025), https://perma.cc/772T-HS2L.

example, influencers were watching as a relatively small crowd of protesters assembled outside the ICE facility. Ex. 1.[15] DHS nonetheless flew *Black Hawk helicopters* over the streets of Portland, and they then deployed tear gas and smoke grenades at the crowd (and at Plaintiff Mindy King far away from the ICE facility, as described below). *Id.* In turn, influencer Nick Sortor posted on X: "DHS has deployed BLACKHAWKS over the ICE facility in Portland, as rioters get tear-gassed and pepperballed by agents … NO MERCY!"[16]

The White House used the influencers' footage of incidents involving chemical munitions for propaganda. On October 4, 2025, the official White House X account released a one-minute video montage of clips showing purported chaos outside the ICE facility, including scenes of tear gas and green smoke enveloping the streets, with most of the footage apparently taken by influencer Katie Daviscourt. 1-SER-150.[17] Daviscourt separately posted video footage the same day of her seemingly embedded with DHS officers, as they stood down Bancroft Street, far from the ICE facility, releasing plumes

---

[15] https://youtu.be/CMteqdAbzVY?si=v6eMONH6J0xSDVJF

[16] https://x.com/nicksortor/status/1974591900146659654

[17] https://x.com/TPostMillennial/status/1974529848535376165

of tear gas directly next to Gray's Landing. 1-SER-152.[18] Four days later, the White House hosted a presidential roundtable with some of the influencers.[19]

The influencers continued to use DHS's use of tear gas for propaganda purposes thereafter, with one posting the next week: "DHS agents just FLOODED THE STREETS at ICE Portland with tear gas and chemical munitions … President Trump has authorized ANY AND ALL force necessary." 1-SER-155.

The nadir of DHS's propaganda efforts, however, was the evening of October 4, 2025. That night, *DHS itself* filmed officers releasing massive quantities of chemical munitions immediately adjacent to Gray's Landing to create a propaganda video for DHS's Instagram account. ER-016–17, ER-048.

As the district court found, although DHS's incident reports from that night documented no uses of chemical munitions beyond the immediate vicinity of the ICE facility, video evidence told a different story. *Id.* "Video evidence documents a large group of federal officers methodically moving protesters eastward on South Bancroft Street away from the Portland ICE

---

[18] https://x.com/KatieDaviscourt/status/1974748903951208802

[19] Brett Samuels, *White House Hosts Conservative Influencers for Antifa Roundtable Amid Portland Protests*, The Hill (Oct. 8, 2025), https://perma.cc/9QLC-Q45B.

Facility in roughly ten-meter increments." ER-047; *see* Ex. 19.[20] Oregon Public Broadcasting filmed and reported that the "[f]ederal officers were flanked by videographers, toting professional equipment and wearing high-visibility vests." 1-SER-135. The videographers "filmed from behind the lines of officers, capturing the show of force," while "[a]t least two drones swept over the scenes." *Id.*; *see* 2-SER-376:1–14; Ex. 2 at 5:25–6:00, 14:00–14:30 (showing videographer wearing yellow vest); Ex. 61 (same).[21]

Once the officers had pushed protesters "a full one-and-a-half to two blocks away from the Portland ICE Facility, [they] deployed large amounts of chemical munitions" immediately next to Gray's Landing, ER-048, dropping tear gas and other chemical munitions at protesters' feet, despite the protesters not having done "anything before officers started using the gas," Ex. 19.[22] Tear gas flooded into Gray's Landing, severely injuring several Plaintiffs. ER-017–18. One Plaintiff was gassed and shot repeatedly with rubber bullets as she tried to flee the gas inside her apartment, even though she was blocks from the ICE facility. 1-SER-070 ¶¶ 10–11.

---

[20] https://youtu.be/NQtm5LATz_o

[21] https://www.youtube.com/playlist?list=PLZZGlWOJfMoKqIGj57J_TvLfa m5rak5aN

[22] https://youtu.be/NQtm5LATz_o

Two days later, DHS posted on its official Instagram account edited footage of chemical munitions deployments outside Gray's Landing, intercut with black-and-white footage of a violin player and set to dramatic music. ER-019–20, ER-048; Ex. 49.[23] The following day, DHS posted another montage showing gas enveloping Gray's Landing set to music. Ex. 47.[24] DHS has "not denied that the chemical cloud footage was from October 4, 2025," ER-048, nor did DHS deny that officers released massive amounts of tear gas that night *specifically to create footage* for these Instagram videos. Government counsel did not deny that fact when asked directly at argument before the stay panel. Oral Arg. 23:02–48.

The still frame below is from the first Instagram video that DHS posted on October 6, 2025, showing Gray's Landing behind a plume of tear gas.[25]

---

[23] https://www.instagram.com/reel/DPeyWCECZv-/

[24] https://www.instagram.com/reel/DPhKJHSibnG/

[25] Screenshot of Ex. 49 at 0:37, https://www.instagram.com/reel/DPeyWCEC Zv-/.

20



**3.** Plaintiffs and other Gray's Landing residents have incurred significant physical and psychological injuries from the repeated and sustained exposures to tear gas and other chemical munitions.

Several Plaintiffs have pre-existing medical conditions that have been significantly exacerbated by the invasion of gas into their homes. Plaintiff Diane Moreno suffers from Cushing's disease and frequent exposure to tear gas in her apartment, lack of sleep, and anxiety have driven her cortisol levels

21

to an unprecedented and dangerous high, leading her to get surgery to have one of her adrenal glands removed. 1-SER-068 ¶ 4, 1-SER-071 ¶¶ 13–14.

Plaintiff Susan Dooley, an elderly Air Force veteran with several pre-existing conditions, fell four times in response to gassing incidents, and has suffered from persistent dizziness, shortness of breath, slurred speech, sleep deprivation, and aggravations to her existing asthma. 1-SER-058.

For Plaintiff Erica del Nigro, tear gas triggers her mast cell activation syndrome, causing extreme and sometimes weeks-long allergic reactions. 1-SER-073 ¶¶ 4, 6–7, 10; 2-SER-269:21–270:5. Erica also lives with her son, J.D., who is one of several children in Plaintiffs' homes that have been physically and psychologically harmed. J.D. has been prescribed an inhaler and anxiety medication due to his regular exposure to chemical munitions and now cannot fall asleep without a gas mask close at hand. 2-SER-277:11–18.

Plaintiff Whitfield Taylor has taken his young daughters, ages 7 and 9, to urgent care on multiple occasions after gas exposure. 1-SER-065 ¶¶ 2, 5–7. When at home, the girls have taken to hiding in Whitfield's bedroom closet to find some refuge. *Id.* ¶ 7.

Plaintiff Jane Doe, who also lives with her daughter, is a domestic violence survivor with severe PTSD that is triggered by the tear gas exposure.

On multiple occasions, Doe fled to her closet in fear, where she urinated on herself in fear. 1-SER-054 ¶ 7; 1-SER-056 ¶ 12. Doe's daughter has also been forced to sleep in the bathtub to try to avoid the gas. 1-SER-056 ¶ 12. So has Plaintiff Moreno. 2-SER-196:24–197:4.

**4.** Plaintiffs' severe physical injuries are no surprise, as the physical effects of tear gas and other chemical munitions are well known. Indeed, as the Centers for Disease Control and Prevention (CDC) has explained, these chemicals are designed to cause pain: they "temporarily make people unable to function … by causing irritation to the eyes, mouth, throat, lungs, and skin."[26] Tear gas and pepperballs are banned weapons under the 1997 Chemical Weapons Convention for these reasons.

Plaintiffs' expert Dr. Rama Rao testified that, though sometimes referred to as "non-fatal," "these terms are misleading and erroneous" as "[d]eath[,] critical illness and injury, and severe and permanent disability have resulted from tear gas exposures." 1-SER-028 ¶ 39. The CDC confirms this fact: it describes exposure to these chemical agents as "poisoning" and states

---

[26] *Riot Control Agents Chemical Fact Sheet*, CDC Chemical Emergencies, (Sept. 4, 2024), https://perma.cc/F3TW-AJQB.

that "[l]ong lasting exposure … may cause severe effects" such as blindness, respiratory failure, and death.[27]

The CDC further states that "[t]he level of poisoning" depends on a variety of factors, including "the location of exposure (indoors versus outdoors)."[28] Because the chemicals stay at higher concentrations for longer indoors, 1-SER-035–36 ¶¶ 66–68, the CDC advises that "[i]f the riot control agents were released indoors, get out of the building."[29]

**5.** Although DHS suggests throughout its brief that tear gas (*i.e.*, CS gas) is a necessary tool for protecting federal property and personnel, the DHS component that is responsible for protecting federal property and personnel—the Federal Protective Service (FPS)—categorically does not use CS gas in carrying out its mission, including at the Portland ICE facility. ER-062–63 ¶¶ 2–6; 2-SER-380:24–25; *see* ER-012–14 (describing types of chemical munitions). Rather, only Customs and Border Protection (CBP) and ICE officers, who have been called upon to assist FPS in managing the crowd outside the ICE facility, use munitions containing CS gas. ER-013. CBP and

---

[27] *Id.*

[28] *Id.*

[29] *Id.*

ICE officers are also the DHS agents who have deployed chemical munitions down the block from the ICE facility—immediately outside Gray's Landing—as a senior FPS official testified that FPS agents do not go to "that area." 2-SER-382:3–4. Instead, FPS limits its use of (non-CS-gas) chemical munitions to the area immediately around the driveway of the ICE facility. *Id.*

Thus, the DHS officers principally responsible for Plaintiffs' injuries, whose conduct would be constrained by the preliminary injunction below, are not the officers charged with protecting federal personnel and property at the Portland ICE facility, and the primary chemical munition at issue (CS gas) is not used at all by that DHS component.

**6.** On March 6, 2026, following an evidentiary hearing and after "review[ing] hundreds of pages of incident reports documenting [DHS's] use of force over the past eight months," the district court issued a preliminary injunction. ER-044. The court held that Plaintiffs have standing and are likely to succeed on a Fifth Amendment substantive due process claim.

Specifically, the district court held that "Plaintiffs have shown a deprivation of their constitutional liberty interest in bodily integrity, and that Defendants' conduct over the course of the last eight months shocks the

25

conscience." ER-032.[30] The court held that Plaintiffs' bodily-integrity rights were burdened through the "nonconsensual exposure and ingestion of toxic airborne substances in the form of chemical munitions … that enter Plaintiffs' homes so as to harm their health." ER-035. The court further found that DHS had time to deliberate in deploying these chemicals, and that DHS acted with deliberate indifference to the known harms to Plaintiffs. ER-043–46.

The district court held this was true both in the context of (1) DHS's overall, repeated pattern of conduct over eight months, which reflected "planning, patterned operations" that consistently "impact[ed] sizable areas away from the Portland ICE Facility, … seemingly contrary to warnings contained in the Use of Force manuals, and in the face of repeated notice of physical harm to the Portland ICE Facility neighbors," ER-043–46; and (2) DHS's use of tear gas in five specific instances where officers deployed massive quantities of gas that infiltrated Gray's Landing. ER-015–27; ER-046–49.

The district court found irreparable harm to Plaintiffs absent an injunction and entered a narrowly tailored preliminary injunction prohibiting

---

[30] The district court declined to reach Plaintiffs' alternative substantive due process theories, based on burdens to Plaintiffs' property interests and right to liberty of movement. ER-006 n.4, ER-032 n.19.

26

DHS officers from deploying chemical munitions in quantities likely to infiltrate Plaintiffs' apartments, unless necessary to address an imminent threat to life. ER-059.

**7.** The government appealed and moved to stay not only the injunction but all proceedings below.[31]

On April 27, 2026, a panel granted the government's motion for a stay of the preliminary injunction pending appeal. The panel held that Plaintiffs categorically could not prevail on their bodily-integrity-based substantive due process claim, because Plaintiffs purportedly could not establish the invasion of a fundamental right under the framework of *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). The panel did not assess whether DHS's conduct shocks the conscience.

The panel also stayed further proceedings in district court, despite the fact that Plaintiffs have multiple claims pending below that were not addressed in the preliminary injunction.

---

[31] By the time the government filed its motion in this Court, it had been operating under a materially similar injunction for 38 days: first under the TRO in *Dickinson v. Trump*, No. 3:25-cv-2170-SI (D. Or.) (entered February 3, 2026), then under the preliminary injunction here (entered March 6, 2026).

27

## SUMMARY OF ARGUMENT

**I.** Plaintiffs have satisfied the threshold requirements for prospective relief and are likely to succeed on the merits.

**A.** Plaintiffs have standing. Plaintiffs live at a fixed location next to the ICE facility where protesters regularly gather. DHS officers regularly deploys chemical munitions in the face of those protests, and when they do, it predictably sends toxic chemicals into Plaintiffs' homes and bodies. It is not remotely speculative whether Plaintiffs will again be exposed to the toxic chemicals that cause them harm.

**B.** Plaintiffs are likely to succeed on the merits of their substantive due process claim.

*First*, this Court's precedents dictate that there are "two different legal standards [for] substantive due process claims": the "fundamental rights" and "shocks the conscience" tests. *Regino v. Staley*, 133 F.4th 951, 960 n.5 (9th Cir. 2025). Because Plaintiffs challenge executive conduct, not legislation, the shocks-the-conscience test applies, under which Plaintiffs must demonstrate conscience-shocking conduct that burdens a liberty interest. *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). And the Supreme Court and this

Court have consistently held that bodily integrity is a liberty interest protected from conscience-shocking executive action.

Because the shocks-the-conscience test governs, Plaintiffs do not need to define and establish a fundamental right that has been infringed, under the standard set forth in *Glucksberg*. But even if Plaintiffs did, the Supreme Court and this Court have long held that the right to bodily integrity is fundamental, have held that the right protects specifically against the government's nonconsensual invasion of the body with foreign substances and chemicals, and have applied the right in new factual contexts. Here, DHS has invaded Plaintiffs' bodily integrity by routinely releasing toxic chemicals that it knew would enter Plaintiffs' homes and bodies, causing severe bodily harm.

The government is also wrong that Plaintiffs cannot assert bodily-integrity claims because officers may have been targeting protesters rather than Plaintiffs with the chemical munitions. Deliberate indifference is the applicable standard for shocks the conscience here, and Plaintiffs allege that DHS has been deliberately indifferent toward them, not others. Plaintiffs are asserting their own substantive right not to have the government knowingly poison their homes and bodies in a deliberately indifferent manner. This Court has rejected the notion that bystanders cannot assert substantive due process

29

violations for harm the government caused them. *Estate of Soakai v. Abdelaziz*, 137 F.4th 969, 976–80 (9th Cir. 2025).

*Second*, DHS's conduct shocks the conscience. Undisputed facts demonstrate that DHS not only had time to deliberate *but did*. The agency and its officials had repeated notice that its conduct was harming Gray's Landing residents. Yet they continued anyway. Even after this lawsuit and Plaintiffs' declarations put the government on direct notice of Plaintiffs' severe injuries, DHS deployed mass volumes of tear gas next to Gray's Landing on more than ten occasions over eight days, and on many of these occasions officers faced no imminent threat at all. Most troubling, DHS has never denied that it has repeatedly released tear gas next to Gray's Landing solely to generate propaganda for social media.

**II.** Plaintiffs' injuries are grave, recurring, and irreparable. DHS's chemical munitions cause Plaintiffs acute respiratory distress, chemical burns, persistent coughing, heart complications, severe PTSD episodes, and other life-long injuries. Only prospective relief can prevent further injuries from DHS's next chemical deployment.

**III.** The injunction is narrow and workable: it bars only chemical-munitions use likely to reach Gray's Landing, unless necessary to address an

30

imminent threat to life. DHS understands the ranges and effects of its munitions, and FPS already protects the facility and its personnel without using tear gas or deploying chemical munitions down the streets surrounding Gray's Landing.

**IV.** Finally, the equities and public interest favor Plaintiffs. The government has a strong interest in protecting federal officers and property, but the public also has an overwhelming interest in preventing law enforcement from using chemical munitions in quantities that foreseeably invade homes and inflict serious injury on innocent civilians. The public interest is served by an injunction that permits necessary law-enforcement responses while preventing unconstitutional government conduct.

## ARGUMENT

### I.   Plaintiffs Are Likely to Succeed on the Merits

This Court "ordinarily review[s] a district court's factual findings for clear error." *United States v. Grey*, 959 F.3d 1166, 1169 n.1 (9th Cir. 2020). But where "the government does not challenge the district court's factual findings [on] appeal," this Court accepts the factual findings "as determined by the district court." *Id.*

31

Here, for each element of Plaintiffs' substantive due process claim, the district court made factual findings after an evidentiary hearing and meticulous review of the record. The government does not challenge *any* of these factual findings on appeal. These findings are amply supported, but the government's failure to even contest them means the findings must be taken as established for purposes of this appeal.

## A. Plaintiffs have standing.

A plaintiff facing future injury has standing where the harm is "certainly impending, or there is a substantial risk" it will occur. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up). While an isolated past injury, standing alone, may not always establish a "real and immediate" threat of repetition, *City of L.A. v. Lyons*, 461 U.S. 95, 110 (1983), "the possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." *Thomas v. County of L.A.*, 978 F.2d 504, 507 (9th Cir. 1992), *as amended* (Feb. 12, 1993) (citation omitted). As this Court has held, an "ongoing, sustained pattern of conduct" creates a non-speculative risk of future injury. *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020).

That standard is easily met here. The district court found that Plaintiffs have suffered repeated injuries caused by DHS's "ongoing, sustained pattern" of releasing chemical munitions immediately adjacent to their homes "for over half a year." *Id.*; *see* ER-029. And the district court further found that DHS is likely to continue that harmful conduct in response to recurring protests outside of the ICE facility. ER-029.

The government ignores these factual findings. It claims that, even when DHS officers deploy gas outside the ICE facility, any exposure to Plaintiffs depends on a "speculative chain of possibilities." Br. 15. But it is hardly "speculative" that the gas DHS deploys outside the ICE facility will reach Gray's Landing and Plaintiffs who live right next to the facility. It is inevitable: Plaintiffs' apartments and property are located in a fixed location immediately adjacent to a fixed ICE facility, and there is no genuine dispute that protests at that fixed location regularly recur and that DHS has repeatedly responded by deploying chemical munitions in a manner that predictably harms Plaintiffs. ER-005–06, ER-035–37, ER-049–54.

For instance, Plaintiffs Jane Doe and Whitfield Taylor and his young daughters live right at the intersection of Moody Avenue and Bancroft Street (less than 100 feet from the ICE driveway), and DHS has routinely deployed

tear gas and chemical munitions in that intersection. 1-SER-065. DHS has also repeatedly shot or dropped tear gas canisters down Bancroft Street just in front of the Gray's Landing courtyard, which adjoins the apartments of Janice Lineberger, Diane Moreno, Erica del Nigro and her son J.D. ER-017–18; *see, e.g.*, 1-SER-019; 1-SER-036; Exs. 1, 16.[32] When DHS officers shoot or drop tear gas down Bancroft Street, which they have done dozens of times, it predictably seeps into these Plaintiffs' apartments. *See* 1-SER-068–69 ¶¶ 4, 8; 1-SER-005–07 ¶¶ 3, 6, 11; *see also* 1-SER-073 ¶ 3, 15.

Thus, one need not know the weather patterns or otherwise speculate whether the gas and smoke that DHS releases will "waft" into Gray's Landing and enter Plaintiffs' homes. *Contra* Br. 15. As the district court found, the toxic chemicals that DHS releases predictably invade the homes and bodies of Plaintiffs, causing severe injuries. ER-028–30 & n.18.

For these reasons, the government's reliance on *Lyons* is misplaced. Br. 16. In *Lyons*, the Supreme Court explained that an individual plaintiff's one-time interaction with law enforcement "does nothing to establish a real and immediate threat" that he would "again be stopped for a traffic violation, or

---

[32] https://www.youtube.com/playlist?list=PLZZGlWOJfMoKqIGj57J_TvLfam5rak5aN

for any other offense," and then subjected to another unconstitutional chokehold. 461 U.S. at 105, 108. Here, by contrast, the Court need not speculate about whether Plaintiffs will again cross paths with DHS officers. Plaintiffs reside at a fixed location next to the ICE facility, and DHS's use of tear gas and chemical munitions outside that ICE facility will continue to injure Plaintiffs. *See* ER-029–30.

There can be no doubt on this score given that DHS has not disclaimed its use of chemical munitions outside Plaintiffs' homes. Far from it: DHS has defended its deployment of these munitions as "critical" and "important" tools for suppressing protests. ER-071 ¶ 36; ER-087 ¶ 31. And DHS officials have acknowledged that they have deployed chemical munitions whenever protesters engage in common and recurring conduct. *See, e.g.*, ER-065–70 ¶¶ 12–14, 17, 20, 28, 31; ER-084–85 ¶¶ 22–23, 25–27; ER-088, ER-096, ER-097, ER-099. This is precisely the type of "ongoing, sustained pattern of conduct" that supports prospective relief. *Index Newspapers*, 977 F.3d at 826.

## B. Plaintiffs are likely to succeed on their substantive due process claim.

The Due Process Clause of the Fifth Amendment "prevent[s] government officials from abusing their power, or employing it as an instrument of oppression." *County of Sacramento v. Lewis*, 523 U.S. 833, 846

(1998) (cleaned up). The Supreme Court has "emphasized time and again that '[t]he touchstone of due process is protection of the individual against arbitrary action of government'" and against the "exercise of power without any reasonable justification." *Id.* at 845–46 (citation omitted). Law-enforcement and other executive conduct violates substantive due process where it is so arbitrary and "egregious" as to "shock the conscience." *Id.* at 846.

DHS's repeated use of tear gas and other chemical agents in and around Gray's Landing has invaded Plaintiffs' liberty interest in their bodily integrity; DHS's recurring use of these chemical weapons without justification—knowing the harms they cause Plaintiffs—shocks the conscience.

   1. *The applicable inquiry is whether DHS's invasion of Plaintiffs' liberty interest in bodily integrity shocks the conscience.*

**a.** This Court reaffirmed last year that there are "two different legal standards [for] substantive due process claims." *Regino v. Staley*, 133 F.4th 951, 960 n.5 (9th Cir. 2025). "One is the 'fundamental rights' standard," *id.*, under which the government may not "infringe … 'fundamental' liberty interests at all, … unless the infringement is narrowly tailored to serve a compelling state interest," *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)

36

(citation omitted). "[T]he other is the 'shocks the conscience' standard," described in *Lewis*, "under which deliberate government action violates the Fourteenth Amendment if it is 'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.'" *Regino*, 133 F.4th at 960 n.5 (quoting *Lewis*, 523 U.S. at 845).

This Court has repeatedly held that the tests are disjunctive: "[The] Due Process Clause protects individuals from state action that *either* 'shocks the conscience' *or* interferes with rights 'implicit in the concept of ordered liberty.'" *Martinez v. City of Oxnard*, 337 F.3d 1091, 1092 (9th Cir. 2003) (emphases added; citations omitted); *e.g.*, *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000); *Nunez v. City of L.A.*, 147 F.3d 867, 871 (9th Cir. 1998); *see also United States v. Salerno*, 481 U.S. 739, 746 (1987).

As the Supreme Court explained in *Lewis*, which test applies depends on whether the challenged conduct is executive or legislative. Although "the touchstone of due process is protection of the individual against arbitrary action of government," the "criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer." *Lewis*, 523 U.S. at 846 (quotations omitted). Legislation (or regulation) is unconstitutionally arbitrary where it infringes on a fundamental

37

right implicit in the concept of ordered liberty and cannot satisfy strict scrutiny. *Glucksberg*, 521 U.S. at 721. But for executive conduct, "the cognizable level of executive abuse of power [is] that which shocks the conscience." *Lewis*, 523 U.S. at 846; *accord Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010).

Justice Scalia objected in *Lewis* that the shocks-the-conscience test departed from the *Glucksberg* fundamental-rights inquiry the Court had delineated a year prior. 523 U.S. at 860–62 (Scalia, J., concurring in the judgment) ("According to today's opinion, [the shocks-the-conscience test] is the measure of arbitrariness when what is at issue is executive, rather than legislative, action." (emphasis omitted)). But his view did not prevail, and *Lewis* remains the Supreme Court's governing precedent.[33]

---

[33] Responding to Justice Scalia, the *Lewis* majority explained that *Glucksberg* concerned the historical test for finding "a substantive due process right entitled to prevail over state legislation," while the shocks-the-conscience inquiry for executive action is "antecedent to any question about the need for historical examples of enforcing a liberty interest of the sort claimed." 523 U.S. at 847 n.8. The majority stated that, if the executive's actions were conscience shocking, there "might there be a debate about the sufficiency of historical examples of enforcement of the right claimed, or its recognition in other ways." *Id.* But the Court noted that "none of [its] prior cases … considered the necessity for such examples," *id.*, and indeed no Supreme Court or Ninth Circuit case has ever held that such historical examples are necessary in the shocks-the-conscience context. The Supreme Court and the Ninth Circuit

Accordingly, this Court has repeatedly analyzed executive conduct under the shocks-the-conscience framework, without requiring a separate *Glucksberg* inquiry into whether the plaintiff identified a fundamental right. *See, e.g.*, *Estate of Soakai v. Abdelaziz*, 137 F.4th 969, 976–80 (9th Cir. 2025), *cert. denied*, No. 25-427 (U.S. Mar. 2, 2026); *Vazquez v. County of Kern*, 949 F.3d 1153, 1162 (9th Cir. 2020); *Nicholson v. City of L.A.*, 935 F.3d 685, 692–95 (9th Cir. 2019); *Lemire v. California Dep't of Corrections*, 726 F.3d 1062, 1075–78 (9th Cir. 2013); *accord Smith v. Albany County Sch. Dist. No. 1 Bd. of Trs.*, __ F.4th __, 2026 WL 1205777, at *9 (10th Cir. May 4, 2026) (explaining there are "two types of substantive due process claims," and applying "the fundamental-rights approach [to] *legislative action*, and the shocks-the-conscience approach [to] tortious *executive action*" (citations omitted)).

As Judge Tymkovich has explained, "[t]his framework makes sense." Timothy M. Tymkovich et al., *A Workable Substantive Due Process*, 95 Notre Dame L. Rev. 1961, 2000 (2020). "[T]he fundamental rights test … is quintessentially one for legislation, not executive acts," and "is ill suited to

---

certainly have never held that a plaintiff must also show the liberty interest at stake meets *Glucksberg*'s test for newly established fundamental rights, if an executive action burdens a liberty interest and shocks the conscience. Were it otherwise, Justice Scalia would have had no reason to criticize the majority for departing from *Glucksberg*'s fundamental-rights standard.

evaluating particular conduct." *Id.* Indeed, the fundamental-rights test does not actually determine whether legislation violates substantive due process; it determines only whether strict scrutiny or rational-basis review applies. *Bowers v. Whitman*, 671 F.3d 905, 916 (9th Cir. 2012). But with executive action, the shocks-the-conscience test is *the* applicable standard; there is no separate inquiry into whether conscience-shocking conduct satisfies strict scrutiny or rational-basis review.

For that same reason, grafting a *Glucksberg* fundamental-right requirement on top of the shocks-the-conscience test for law-enforcement conduct would produce incongruous results. It would mean legislation may be sufficiently arbitrary to violate substantive due process even if fundamental rights are not implicated (under rational-basis review), but executive actions could not. There is no doctrinal basis for that divergence.

**b.** Plaintiffs' claim arises under *Lewis*, not *Glucksberg*. Plaintiffs challenge executive conduct: Plaintiffs allege that DHS officers repeatedly deployed chemical munitions in a manner that predictably caused toxic chemicals to enter Plaintiffs' homes and bodies, and that DHS acted with deliberate indifference to Plaintiffs' harms in doing so. That is a quintessential shocks-the-conscience claim.

40

Plaintiffs therefore did not need to meet the *Glucksberg* test for identifying a new, narrowly defined fundamental right that is deeply rooted in history and tradition and implicit in the concept of ordered liberty. They needed to identify, as a threshold to the shocks-the-conscience inquiry, only a cognizable life, liberty, or property interest. And they did so.

The relevant liberty interest here is Plaintiffs' right to bodily integrity. The Supreme Court has specifically held that individuals have a protected liberty interest in bodily integrity, which encompasses the liberty against "[t]he forcible injection" of chemicals "into a nonconsenting person's body." *Riggins v. Nevada*, 504 U.S. 127, 134 (1992) (quotation marks omitted).

The Supreme Court has held that the deprivation of bodily integrity by executive actors violates substantive due process where it "shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172–74 (1952). This Court has repeatedly held the same, post-*Glucksberg*, without *ever* analyzing whether the particular invasion of bodily integrity at issue met *Glucksberg's* fundamental-rights test. *See, e.g., Vazquez*, 949 F.3d at 1162; *Pauluk v. Savage*, 836 F.3d 1117, 1122–25 (9th Cir. 2016); *Polanco v. Diaz*, 76 F.4th 918, 926–30 (9th Cir. 2023); *Nicholson v. City of L.A.*, 935 F.3d 685, 692–95 (9th Cir.

41

2019); *Plumeau v. Sch. Dist. No. 40*, 130 F.3d 432, 438 (9th Cir. 1997); *P.B. v. Koch*, 96 F.3d 1298, 1302 (9th Cir. 1996).

Here, DHS's repeated release of tear gas and other toxic chemicals next to Gray's Landing, knowing that the chemicals were infiltrating Plaintiffs' homes and invading their bodies, implicates Plaintiffs' liberty interest in bodily integrity.

### 2. *Plaintiffs assert a fundamental right regardless*

Because Plaintiffs assert a shocks-the-conscience claim under *Lewis*, the government's argument (at 19–28) that Plaintiffs cannot "establish a new fundamental right" under *Glucksberg* is irrelevant. In any event, even if Plaintiffs did have to demonstrate that DHS's conduct implicates a fundamental right, they have done so.

Supreme Court and Ninth Circuit precedent—including *Glucksberg* itself—recognizes the right "to bodily integrity" as one of the few already-established "fundamental rights and liberty interests" protected by substantive due process. 521 U.S. at 720; *see Albright v. Oliver*, 510 U.S. 266, 272 (1994). This right traces back to the Supreme Court's recognition over a century ago that no right is "more carefully guarded … than the right of every individual to the possession and control of his own person, free from all

42

restraint or interference of others." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891). And as mentioned, the Supreme Court has specifically held that this fundamental right encompasses protection against "[t]he forcible injection" of chemicals "into a nonconsenting person's body." *Riggins*, 504 U.S. at 134 (quotation marks omitted).

The Supreme Court has applied this fundamental right across multiple forms of compelled bodily intrusion or physical invasion, including stomach pumping to collect evidence, *Rochin*, 342 U.S. at 172–74; corporal punishment, *Ingraham v. Wright*, 430 U.S. 651, 672–74 (1977); and unwanted medical treatment, *Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278–79 (1990); *Riggins*, 504 U.S. at 134–35. In none of those cases did the Court ask whether there was a deeply rooted historical tradition protecting against the precise *mechanism* of invasion—be it a stomach pump, a paddle, a scalpel, a feeding tube, or antipsychotic medication. The protected right was bodily integrity.

This Court has applied the same principle. It has held that "it is well established that a person's liberty interest in bodily integrity is one of the personal rights accorded substantive protection under the Due Process Clause." *Johnson v. Meltzer*, 134 F.3d 1393, 1397 (9th Cir. 1998). And it has

43

applied this right in new contexts far removed from medical battery, including sexual and physical abuse against students, *Plumeau*, 130 F.3d at 438; *P.B.*, 96 F.3d at 1302; sexual harassment and abuse in the workplace, *Vazquez*, 949 F.3d at 1162; exposure to toxic mold or disease, *Pauluk*, 836 F.3d at 1122–25; *Polanco*, 76 F.4th at 926–30; and injuries to bystanders, *Nicholson*, 935 F.3d at 692–95. This Court found the right to bodily integrity protected across all of these post-*Glucksberg* cases, and has never conducted a *Glucksberg* inquiry into whether the relevant method of invading bodily integrity warranted protection.

The government attempts to narrow bodily integrity to the "fundamental right [to be] free from nonconsensual medical procedures and treatment." Br. 23. But this Court has repeatedly held that a person's right to bodily integrity may be violated outside of medical contexts. *Supra* Section I.B.1. And other circuits have come to the same conclusion in closely analogous toxic-exposure cases. In *Guertin v. Michigan*, the Sixth Circuit held that government officials violated bodily integrity by knowingly causing lead-contaminated water to enter residents' homes and bodies. 912 F.3d 907, 919–22 (6th Cir. 2019). And in *Washington v. Housing Authority of the City of Columbia*, the Fourth Circuit held that a tenant stated a bodily-integrity claim

against a public housing authority where it acted with deliberate indifference to carbon monoxide entering a tenant's home. 58 F.4th 170, 176–82 (4th Cir. 2023).

The stay panel recast Plaintiffs' asserted right even more narrowly, as a "supposed constitutional right to be free from exposure to tear-gas chemicals used by law enforcement officers as a means of crowd control." Stay Order 8. The panel then held that "no such right exists" because Plaintiffs had not identified historical authority addressing that precise mechanism of bodily invasion. *Id.* But none of this Court's or the Supreme Court's cases require plaintiffs to identify a deeply rooted history of protections against the same weapon, contaminant, conduct, or delivery method for invading a person's bodily integrity. By defining the right at the level of DHS's chosen means of injury, the panel turned the question of whether there is a substantive due process violation into a version of qualified immunity that this Court has rejected. *See Regino*, 133 F.4th at 961–62.[34]

---

[34] Likewise, the panel's characterization that DHS uses tear gas "as a means of crowd control" (Stay Order 8) is both factually disputed and legally irrelevant to whether Plaintiffs' bodily integrity has been burdened. The purpose underlying DHS's deployments of tear gas goes to whether its conduct shocks the conscience. *See infra* Section I.B.5.

Both the government and the stay panel overlook that the *Glucksberg* test is used for evaluating newly claimed unenumerated rights—not applications of the short list of rights already held to be fundamental. In *Obergefell v. Hodges*, the Supreme Court rejected the argument that *Glucksberg's* "careful description" requirement meant the Court had to evaluate whether there was a historical tradition for the "right to same-sex marriage." 576 U.S. 644, 671 (2015). Just as "*Loving* did not ask about a 'right to interracial marriage,'" the relevant due process right was "the right to marry in its comprehensive sense." *Id.* Just recently, the Supreme Court applied the fundamental right to "the upbringing and education of children" to a novel context, holding that this right was violated by California policies that "prevent schools from telling [parents] about their children's efforts to engage in gender transitioning at school." *Mirabelli v. Bonta*, 146 S. Ct. 797, 800, 803 (2026).

Like the right to marriage and the right to the upbringing and education of children, the right to bodily integrity is an established fundamental right.

46

Courts can and must apply that right in new factual contexts, as both this Court and the Supreme Court have for over a century.[35]

The government's authorities are inapposite. *Foli v. Metropolitan Water District of Southern California*, 592 F. App'x 634 (9th Cir. 2015), is an unpublished memorandum disposition, and it distinguished fluoridated municipal water, which residents can decline to drink, from forced bodily intrusion that triggers constitutional protection. *Id.* at 635. Here, Plaintiffs cannot avoid breathing toxic gases forcibly released into their homes.

Nor does the government's string cite (Br. 22–23) provide any support. In every case, the emissions at issue were made by *private* parties, not government agents; the alleged harms involved generalized exposure risks

---

[35] The district court correctly cited the long history of courts applying the right to bodily integrity in various factual circumstances, but, citing *Glucksberg*, the court set out to carefully define the right at issue in this case. That was unnecessary, both because the right to bodily integrity is the relevant right, and because the fundamental-rights test need not be met for executive conduct. Plaintiffs throughout this case have relied on the shocks-the-conscience standard and have never suggested that a *Glucksberg* inquiry is necessary. In any event, were that inquiry necessary, the district court correctly concluded that the right not to have the government repeatedly inject poison gas into one's home is implicit in the concept of ordered liberty and consistent with our country's history and tradition—throughout which no government has ever engaged in the conduct challenged here.

47

affecting broad populations; and the claims amounted to generalized complaints about the environment.

### 3. Plaintiffs may challenge the deprivation of their rights regardless of whether they are intended targets.

Citing *O'Bannon v. Town Ct. Nursing Center*, 447 U.S. 773 (1980), the government argues that there is no "deprivation" of liberty "when a plaintiff is incidentally affected by governmental action taken against a third party." Br. 17–18. But this argument rests on a fundamental misunderstanding of Plaintiffs' claims and of *O'Bannon*.

*O'Bannon* held only that nursing home patients had no procedural due process right to participate in an administrative hearing regarding whether to decertify the business that ran the facility. 447 U.S. at 775. The harm was purely derivative: the nursing home was the direct object of the government's regulatory action; patients were secondarily harmed. *O'Bannon*'s "indirect effects" language addressed only whether patients had a procedural right to intervene in a regulatory proceeding against a company—nothing more.

Here, by contrast, Plaintiffs challenge law enforcement's deliberative indifference *toward Plaintiffs* and their injuries. They challenge DHS's deliberate indifference in firing chemical munitions in volumes that directly harm Plaintiffs, by predictably saturating their apartments, invading their

48

bodies, and causing them documented, serious physical injuries. *See* ER-042. Plaintiffs here, unlike the *O'Bannon* plaintiffs, are the object of the government's deliberately indifferent conduct.

The government's position that Plaintiffs cannot assert their own substantive due process rights in these circumstances runs counter to the premise of the deliberate indifference doctrine, which is that an official's conduct need not intentionally target the plaintiff to violate substantive due process. *See Guertin*, 912 F.3d at 922–28. Thus, in *Polanco*, the conscience-shocking government action was knowingly transferring infected inmates into San Quentin prison, putting correctional officers at risk. 76 F.4th at 926–30. There was no argument that the government directed its conduct at the officers; liability was based on the government's deliberate indifference to the risk that officers would get sick. *See id.*

Even if Plaintiffs were considered "bystanders," this Court held last year that a bystander may assert a substantive due process claim where conduct targeted at another person injures the bystander. *Abdelaziz*, 137 F.4th at 977–80. That case involved intent to harm, not deliberate indifference, but it refutes the government's "incidental effects" argument all the same. This Court found "no reason to think that conduct is any less shocking when it

injures someone other than the intended target, particularly when harm to a third party is a clear, known risk and is entirely foreseeable." *Id.* at 980.

The government's hypotheticals (Br. 19) prove too much. Medical malpractice is not automatically a constitutional violation, but deliberate indifference to serious medical needs is. *Estelle v. Gamble*, 429 U.S. 97, 104–06 (1976). False imprisonment is not automatically a constitutional violation, but arbitrary detention without a lawful basis is. *Baker v. McCollan*, 443 U.S. 137, 142–46 (1979). So too here: ordinary environmental disturbances may sound in tort, but the government's knowing, repeated release of toxic chemicals into residents' homes and bodies violates substantive due process where it is so egregious and without justification as to shock the conscience.

### 4. *DHS acted with time to deliberate.*

The legal standard for whether executive conduct shocks the conscience depends on whether officers had a practical opportunity to deliberate before acting. Where officers have time to deliberate, Plaintiffs need only show "deliberate indifference" to their harms, but if officers must make a "snap judgment" with no chance to deliberate, plaintiffs must show that officers acted with "a purpose to harm unrelated to legitimate law enforcement

objectives." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *see Lewis*, 523 U.S. at 851–53.

The district court correctly found that DHS officers had time to deliberate when deploying chemical munitions that harmed Plaintiffs. The government does not challenge those factual findings as clearly erroneous, forfeiting any such argument. And even if they did, the evidence overwhelmingly shows that DHS officials not only had time to deliberate, but did.

The district court found that DHS acted with time to deliberate both over the course of the eight-month period in which DHS deployed the munitions dozens of times, and in the context of specific incidents. As to the broader pattern, the district court found "the record reflects eight months of planning, patterned operations, and inter-agency coordination." ER-043. The record supports that finding. Video and testimonial evidence showed recurring deployments in response to predictable fact patterns: when a protester stepped a foot or toe over the blue line that ICE had drawn at the end of its driveway, when officers knew that vehicles were about to enter or exit the ICE facility, and when officers conducted pre-planned operations near Gray's

51

Landing. *See* 1-SER-054 ¶ 6; Ex. 1 at 2:20; Ex. 18 at 3:55; Ex. 19.[36] And, of course, DHS deployed the munitions dozens of times over an eight-month period, and it certainly had time to deliberate on whether to continue to engage in this course of conduct over that period, including after receiving notice that the munitions were harming Gray's Landing residents.

The record also supports the district court's findings that DHS had time to deliberate within individual incidents. For example, video evidence showed that, on the evening of October 4, 2025, officers slowly pushed protesters down the street for roughly ten minutes, until they were far from the ICE facility, and then dropped and lobbed tear gas canisters at the feet of protesters in response to no provocation. ER-017, ER-047; Ex. 19.[37] And DHS has never denied that its use of tear gas that night was *pre-planned* to create a propaganda video; videographers trailed the officers while they unleashed tear gas outside Gray's Landing, and that footage then featured in DHS Instagram posts two days later. ER-018–20, ER-048; Exs. 47, 49.[38]

---

[36] Exs. 1, 18, https://www.youtube.com/playlist?list=PLZZGlWOJfMoKqIGj 57J_TvLfam5rak5aN; Ex. 19, https://www.youtube.com/watch?v=NQtm5LA Tz_o.

[37] https://www.youtube.com/watch?v=NQtm5LATz_o

[38] https://www.youtube.com/playlist?list=PLZZGlWOJfMoKqIGj57J_TvLfa m5rak5aN

Similarly, on January 30, 2026, a relatively small group of protesters was merely "standing on the public sidewalk" when officers opened the gate to the ICE facility, walked out, and started firing tear gas in a manner that was obviously planned. ER-022; Ex. 46.[39] On February 1, officers had cleared the driveway and were standing around in the driveway facing no imminent threat, when they started casually lobbing gas and smoke munitions in all directions. Ex. 55 at 0:50–2:30.[40] These are just a few of the many incidents captured on camera where officers' tear gas deployment was indisputably pre-planned and not split-second reactions to unforeseen emergencies.

The government does not dispute any of those factual findings. Instead, it relies on cases where officers did *not* have time to deliberate. *See* Br. 29–30. *Whitley v. Albers*, 475 U.S. 312 (1986), involved a single use of deadly force during an active prison riot in which an officer had been taken hostage. *Id.* at 314–16. Likewise, *Puente v. City of Phoenix*, 123 F.4th 1035, 1055–56 (9th Cir. 2024), was a one-time response to a one-time protest where conditions "escalated quickly." *Id.* at 1055–56. Neither case holds that officers never have

---

[39] https://youtu.be/2hUBj3Jz1t4

[40] https://youtu.be/Da26KgUlXsA

time to deliberate, or that deliberate indifference is unavailable whenever officers need "to balance competing public safety obligations." *Contra* Br. 30.

> ### 5. *DHS's deliberate indifference to Plaintiffs' harms shocks the conscience.*

Finally, the district court correctly held that DHS likely acted with conscience-shocking, deliberate indifference to Plaintiffs' injuries.

**a.** As the district court found and the government does not dispute, "Defendants were specifically notified of the harm that their widescale deployments of chemical munitions were having on the Resident Plaintiffs, but Defendants chose to use chemical munitions anyway, often in large quantities." ER-036. That notice came from Gray's Landing staff, from congressional outreach, and from this lawsuit itself. ER-045; *see* 1-SER-082 ¶ 5; 1-SER-161.

DHS did not temper its use of tear gas and other chemical munitions next to Gray's Landing in response to this repeated notice. Far from it—when a Gray's Landing staffer told officers that the chemical munitions were poisoning people inside Gray's Landing, the officers literally laughed at her and cracked jokes that the gas was "environmentally friendly." 1-SER-082 ¶ 5. After Plaintiffs filed declarations in this case detailing the severe physical effects of the gas on them, DHS's use of tear gas only *increased*, with officers

deploying mass volumes of tear gas next to Gray's Landing on over ten occasions over an eight-day span between January 24 and February 1, 2026. *See* ER-014–27; Exs. 37–46.[41] DHS knew Plaintiffs (and others) were suffering, yet they did it anyway.

The district court found an overall pattern of deliberate indifference based on the "repeated, large-scale deployments of chemical munitions, impacting sizable areas away from the Portland ICE Facility, coordinated with large numbers of officers, seemingly contrary to warnings contained in the Use of Force manuals, and in the face of repeated notice of physical harm to the Portland ICE Facility neighbors." ER-044–46.

With respect to DHS's repeated use of tear gas far from the ICE facility, the district court emphasized the testimony of FPS Deputy Director Cantu. FPS is "the primary agency charged with protecting the ICE Facility" and the personnel within it. ER-044. Not only does FPS not use tear gas as a categorical matter, ER-013, ER-044, but the FPS Deputy Director testified that FPS does not venture beyond the driveway to the ICE facility and the area immediately outside it in performing its protective mission. ER-044. And

---

[41] https://www.youtube.com/playlist?list=PLZZGlWOJfMoKqIGj57J_TvLfa m5rak5aN

yet, the record shows numerous instances of other DHS components marching hundreds of feet away from the ICE facility to release chemical munitions immediately outside Gray's Landing; "of spent munitions located in the Gray's Landing courtyard"; and of "the chemical munition deployment reaching the north side of Gray's Landing—one block from the Portland ICE Facility." ER-044–45.

**b.** The district court also detailed five individual instances of tear gas use that reflected deliberate indifference. In all but one of these incidents, Plaintiffs' video evidence showed deployments not mentioned in DHS's incident reports, and they all featured circumstances in which officers mass-deployed gas while facing little-to-no threat.

Three of the incidents post-dated the filing of this case and motion for preliminary injunction. On the evening of January 24, 2026, federal officers reported deploying at least 85 tear gas munitions. ER-020–21. At least one canister struck Gray's Landing itself, leaving a burn mark. Plaintiffs reported chemical munitions fired every hour from 7:00 p.m. to 11:00 p.m., with gas entering apartments within minutes of each deployment. *Id.* Officers continued deploying tear gas even after the protests had visibly shrunk. *Id.* Chemicals flooded Plaintiff Doe's apartment that night, causing severe

56

coughing. *Id.* Doe slept in the closet that night and urinated on herself from fright, while her teenage daughter slept in the bathtub. 1-SER-055 ¶ 12. Plaintiff Lineberger similarly suffered impaired breathing, headaches, lost sleep, and anxiety. ER-021.

On January 30, 2026, contrary to depictions in DHS's incident reports, video evidence shows that protesters were "standing on the public sidewalk" outside the ICE facility, not engaged in violence, when officers walked out of the facility's gates and started firing chemical munitions onto the street, with at least one tear gas canister launched toward Gray's Landing. ER-022; Ex. 46 at 0:09–2:13.[42]

On January 31, 2026, roughly 3,000 protesters—including children and elderly people—participated in an organized march that ended at the ICE facility. ER-023–24. At 4:32 p.m., federal officers began deploying chemical munitions from both the facility driveway and roof. ER-024. Two minutes later, they shattered a third-story window of Gray's Landing with a long-range tear gas projectile. *Id.* By 4:36 p.m., the gas cloud had reached the north side of Gray's Landing, more than a block from the ICE facility, and security footage captured elderly people and children rushing into Gray's Landing's

---

[42] https://youtu.be/2hUBj3Jz1t4

lobby to escape. ER-024–25. Inside, the building was no refuge: security cameras showed residents covering their faces and rubbing their eyes in hallways and elevator banks, unable to escape the toxic gas. *Id.* Paramedics who responded to Plaintiff Roe's 911 call told her the gas was worse inside the building than outside and led her back outdoors to breathe. ER-025. Plaintiff del Nigro suffered severe migraines lasting weeks after the incident, and she and her son developed a burning rash and hives across their bodies. ER-025–26.

On February 1, 2026, federal officers deployed chemical munitions repeatedly over a seven-hour span. ER-026. Video evidence showed "gas canisters launched far down South Bancroft Street near the courtyard of Gray's Landing," and officers standing around the ICE driveway before "lobbing" munitions far into the crowd of protesters, with gas clouds traveling far up Moody Avenue, down Bancroft Street, and into Gray's Landing's courtyard. *Id.* (citing Pls.' Ex. 56, at 5:40–8:00).[43] Upon returning from a trip that night, Plaintiff King experienced symptoms—an extremely dry throat she described as "like swallowing glass"—from residual contamination alone. ER-026–27. Her condition worsened until she had to seek medical attention. *Id.*

---

[43] https://youtu.be/L4TN3vRLUMQ

Throughout these incidents, DHS knew that its use of chemical munitions was harming small children, people with medical conditions, domestic violence victims, and other residents, yet they kept doing it anyway. They did so even though they could protect the ICE facility and its personnel without using tear gas and other munitions in such a manner, as we know from FPS's policy and the five weeks that DHS protected the facility while under injunctions in this case and *Dickinson*. "When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Lewis*, 523 U.S. at 853.[44]

**c.** Beyond shocking, however, is DHS's repeated use of tear gas next to Gray's Landing to create propaganda videos, which the government has never denied throughout this case.

---

[44] The district court also found deliberate indifference during an incident on the afternoon of October 4, 2025. Then, as DHS flew Black Hawk helicopters overhead and influencers were posting about the active tear-gas deployments to social media, Ex. 1 at 0:16–0:30, https://youtu.be/CMteqdAbzVY; https://x.com/nicksortor/status/1974591900146659654, an officer launched a long-range tear-gas canister from the street outside the ICE facility in the direction of Plaintiff King, who was filming from her balcony. Ex. 1 at 2:38–2:41. The canister "travel[ed] east approximately 150 feet away toward Plaintiff King and Gray's Landing," landing immediately under her balcony. ER-047. The evidence did not show any protesters in the vicinity of King's balcony, and DHS offered no "information to justify this long-distance deployment of chemical munitions toward a residential apartment," raising an inference of deliberate indifference at best. *Id.*

The government has not denied that, in the weeks following the President's announcement in late September 2025 that he was sending the National Guard, DHS invited "influencers" to film from the ICE facility, nor that DHS used mass volumes of tear gas to create "content" for these influencers. ER-018–20; ER-048. Nor has DHS denied that it released tear gas and other chemical munitions during this time to create its own propaganda videos for social media.

On the evening of October 4, 2025, "[f]lanked by videographers toting professional equipment and wearing high-visibility vests," and with DHS drones capturing footage overhead, officers methodically pushed protesters several hundred feet down Bancroft Street. 1-SER-135; *see* ER-018–19, ER-047; Ex. 19. Stopping on the street immediately outside Gray's Landing and its courtyard, with protesters standing still, officers began dropping tear gas canisters at the feet of protesters and casually lobbing yet more tear gas down the block, despite the protesters not having done "anything before officers started using the gas," Ex. 19[45]; *see* Ex. 2 (video of entire episode).[46] The result was "visible plumes of gas" that immediately infiltrated Gray's Landing

---

[45] https://youtu.be/NQtm5LATz_o

[46] https://youtu.be/llDdyJ4JNds

apartments, causing Plaintiffs and many other residents "serious adverse effects" to their bodies. ER-018–19.

Two days later, DHS posted on its official Instagram account edited footage of chemical munitions deployments outside Gray's Landing. ER-018–20, ER-048; Ex. 49.[47] The following day, DHS posted another montage showing gas enveloping Gray's Landing. Ex. 47.[48]

DHS has "not denied that the chemical cloud footage was from October 4, 2025," ER-048, nor did DHS deny that its officers released massive amounts of tear gas that night *specifically to create footage* for these Instagram videos. And when asked directly at oral argument before the stay panel whether this tear gas use was to create propaganda, the government again did not deny it. Oral Arg. 23:02–48. If that conduct does not shock the conscience, nothing could.

**d.** None of the government's responses hold water. The district court did not find deliberate indifference based solely on "the *quantity* of chemical munitions and their *distance* of impact." Br. 32 (quoting ER-044). The district court found deliberate indifference based on a combination of many facts,

---

[47] https://www.instagram.com/reel/DPeyWCECZv-/

[48] https://www.instagram.com/reel/DPhKJHSibnG/

including the months-long period of the deployments; the fact that munitions often landed on the streets surrounding Gray's Landing; the FPS's deputy director's testimony that his officers had "no business" leaving the immediate vicinity of the facility; the repeated, documented notice to DHS of harm to residents beginning in July 2025; and the disparity between the wide-scale deployment of chemical munitions and the limited reports of unlawful behavior by protesters. ER-044–49.

The government's clear-error argument fares no better. DHS says the district court relied on testimony about where FPS officers deploy munitions, even though some deployments were carried out by ICE or CBP. Br. 33. But the point is simply that chemical deployments farther from the facility (including in Gray's Landing's courtyard and a full city block away) cannot be explained or justified by DHS's purported motivation of protecting the building and its personnel, or facilitating entry or egress, when the agency charged with that very mission believes that such deployments are unnecessary. ER-044–45.

The government is also wrong that the district court shifted the burden of proof. Br. 34. Plaintiffs carried their burden through declarations, live testimony, expert evidence, video evidence, photographs, congressional

correspondence, agency reports, and DHS's own use-of-force materials. Once Plaintiffs made that showing, the district court was entitled to consider DHS's *failure* to provide a non-conclusory justification for particular deployments, quantities, and locations—especially because DHS possessed the operational information needed to explain those choices.

As for the district court's invocation of DHS's use-of-force policies, the point is not that every violation of an agency manual is a constitutional violation. *Contra* Br. 34. It is that DHS's manuals identified specific factors counseling against the use of chemical munitions, including the presence of vulnerable bystanders and people unable to leave the area. *See* ER-045. On that record, the district court reasonably inferred that DHS did not meaningfully account for the very factors its own policies required it to consider.

## II.   Plaintiffs Have Suffered, and Will Continue to Suffer, Grievous Bodily Harm Absent an Injunction

The record amply supports the district court's finding that Plaintiffs are suffering, and will continue to suffer, irreparable harm. For one, "[i]t is well established that" a deprivation of constitutional rights alone "unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation omitted). And the record shows that Plaintiffs have

63

suffered concrete physical and psychological injuries, both acute and potentially long-lasting, that will recur if DHS uses chemical munitions again. ER-005–06, ER-035–37, ER-049–54.

Jane Doe is a domestic violence survivor who moved to Gray's Landing to escape an abusive relationship after a former partner shot her in the head. 1-SER-053–54 ¶¶ 3–4. Doe has a metal rod in her head and is deaf in one ear as a result of the attack. *Id.* DHS's response to the protests, including the use of tear gas, triggers her PTSD. *Id.* ¶ 7. On one occasion, Doe fled to her closet in fear and urinated on herself as a reaction to the triggering of her PTSD. *Id.* Doe, who lives on the southwest corner of Gray's Landing closest to the ICE facility, has had tear gas fill her apartment on a sustained basis, including several particularly severe episodes. *Id.* ¶¶ 8–12. Doe lives with her daughter who lost a pregnancy during the pendency of this case. *Id.* ¶ 2. On one occasion in July 2025 when tear gas filled Doe's apartment, the gas masks she had purchased did not protect her or her family and the gas was so invasive that chemicals got into Doe's food and left a green residue on Doe's window screens. *Id.* ¶ 8. After this and similar incidents, Doe has been left crying, struggling to breathe, and with her home and belongings full of gas. *Id.* ¶¶ 8–

64

9. On January 24, gas again entered her home; she slept in the closet, while her daughter slept in the bathtub. *Id.* ¶¶ 11–12.

Susan Dooley is a 72-year-old Air Force veteran who served during the Vietnam War and has asthma, diabetes, fibromyalgia, and mobility limitations requiring a walker. 1-SER-057 ¶ 2. Chemical munitions routinely infiltrated her apartment on Moody Street. 1-SER-058 ¶ 4. Since the government's use of chemical weapons began, Dooley has suffered dizziness, shortness of breath, sleep deprivation, worsened asthma, reduced blood oxygen saturation, difficulty speaking clearly, and slurred words. *Id.* ¶ 5. In October 2025, she fell four times and required medical assistance each time. *Id.* The VA sent her to the emergency room because of her symptoms; physicians found low blood saturation and diagnosed shortness of breath and very mild heart failure. ER-051; 1-SER-058 ¶ 6. The chemicals linger for days in her carpets and belongings. 1-SER-058 ¶¶ 7–8.

Janice Lineberger has suffered significant respiratory injuries from repeated exposure to tear gas. 1-SER-062 ¶ 7. During one severe incident, gas struck her in the parking garage before she could even reach the elevator; her face, eyes, and scalp itched, and she had difficulty breathing after walking from the car to the elevator and to her apartment. *Id.* ¶ 6. Her voice has

65

changed indefinitely and is now, in her words, "very gravel[l]y, as if [she] was a chain smoker." *Id.* ¶ 7. Each time tear gas enters her apartment, her respiratory symptoms worsen. ER-051–52; 1-SER-062 ¶ 6. Lineberger could not use her patio for the entire summer and no longer goes outside at night. 1-SER-061 ¶ 5. After tear gas entered her home in January, her voice worsened, her breathing was impaired, and she developed a significant headache. 1-SER-063 ¶ 10.

Whitfield Taylor lives with his two children, ages seven and nine, at the closest point of Gray's Landing to the ICE facility. 1-SER-065 ¶¶ 2–3. Officers often fire canisters from the ICE facility roof, and the canisters frequently strike Gray's Landing property. 1-SER-066 ¶ 5. Taylor seals windows, places towels under doors, and tries to plug gaps, but the gas still enters his apartment. *Id.* When it does, it burns his and his children's eyes and causes severe throat irritation. *Id.* ¶ 6. His children have required urgent-care treatment after tear gas exposure, missed school, lost sleep, and had difficulty focusing in class. *Id.* ¶ 7. They sometimes hide in a closet in Taylor's bedroom to feel safe when federal officers use gas and flashbangs outside their windows. *Id.* As the district court correctly recognized, children should not have to seek

urgent care or hide in closets because the government has made the air in their home unsafe. *See* ER-052.

Erica del Nigro and her twelve-year-old son, J.D., have developed lasting respiratory and immune consequences. Del Nigro has mast cell activation syndrome, an autoimmune condition that makes environmental triggers such as smoke and gases potentially dangerous and can put her at risk of life-threatening anaphylaxis. 1-SER-073 ¶¶ 4–5. Tear gas has triggered severe and long-lasting allergic reactions: dizziness, nausea, vomiting, inflamed eyelids causing painful styes, and a full-body rash that lasted about six weeks. 1-SER-074 ¶ 6. She developed persistent wheezing, congestion, and post-nasal drip and began using an inhaler. 1-SER-074 ¶ 7. After DHS used tear gas again in January, her migraines, hives, and eye inflammation returned. 1-SER-075 ¶ 10. Her son J.D. likewise developed chronic respiratory problems requiring an inhaler and has developed serious anxiety about walking in the streets outside his home, resulting in being prescribed anti-anxiety medication. 1-SER-075 ¶¶ 11–12. He cannot even fall asleep without a gas mask beside his bed. 2-SER-277:11–18.

Diane Moreno's injuries are potentially life-threatening. Moreno has Cushing's disease, which causes excessive cortisol production; sustained high

67

cortisol can cause cardiac problems, blood clots, immune-system failure, and other serious emergencies. 1-SER-068 ¶ 4. She has detected tear gas in her apartment at least thirty times. 1-SER-069 ¶ 7. Exposure causes major respiratory problems, chest tightness, serious sinus problems including bloody nasal discharge, and wheezing severe enough that her doctor prescribed an inhaler even though she never previously had asthma. 1-SER-069 ¶ 8. She went to urgent care with respiratory distress from being gassed in her apartment. 1-SER-069 ¶ 9. The stress, sleep disruption, and repeated gas exposure drove her cortisol levels to unprecedented and dangerous levels. 1-SER-071 ¶ 13. Her doctors recommended removal of an adrenal gland to control those spikes. Moreno has since had that procedure and further tear-gas exposure presents significant risk. ER-052; 1-SER-071–72 ¶¶ 13–16. No later merits judgment can remove the risk of adrenal crisis from another exposure any more than it can restore an organ that had to be removed.

Roy Brooks has already suffered irreversible muscle loss and further exposure presents the same risk. Brooks has limb-girdle muscular dystrophy, a genetic disorder that causes muscular atrophy, and his body cannot rebuild lost muscle tone. 1-SER-078 ¶ 6. Any lost muscle is therefore permanent. *Id.* The nightly explosions of tear-gas launchers and flashbangs disrupted his

sleep, which led to significant loss of muscle tone. 1-SER-078 ¶¶ 5, 7–8. Before the summer, Brooks could transfer from his wheelchair to a standard toilet and back without assistance; now he cannot and likely never will again. 1-SER-078 ¶¶ 5, 7–8. A similar period of sleep disruption and anxiety would risk permanent and life-threatening pulmonary or cardiac damage. 1-SER-079 ¶ 9.

The effects of chemical munitions are inescapable for Gray's Landing residents. Plaintiffs have tried to protect themselves, with little effect. They have closed windows, placed wet towels under doors, sealed gaps, run air purifiers, slept in gas masks, slept in closets and bathtubs, and avoided patios. ER-036–37 & n.21. These efforts have failed because of the overwhelming volume of chemical munitions that DHS has released immediately outside of a large, residential building. Many Gray's Landing residents want to leave, but they cannot afford to. *See* 1-SER-076 ¶ 14; 1-SER-079 ¶ 12. The injunction was necessary because Plaintiffs cannot self-help their way out of chemical exposure in their own homes.

Nor is future harm speculative. DHS has defended its use of chemical munitions and has not expressed an intent to change its practices. ER-053. DHS deployed chemical munitions on seven dates in January and on February 1, 2026, before being enjoined. ER-053. Absent judicial intervention, Plaintiffs

69

will remain at risk of severe physical and psychological injuries when DHS predictably releases chemical munitions in quantities that enter Gray's Landing.

## III.   The District Court Did Not Abuse Its Discretion in Crafting Relief

The district court narrowly tailored its injunction to give "due regard to the competing interests between Defendants' need to do their jobs safely and the Resident Plaintiffs' right to the most fundamental aspects of liberty." ER-058. The injunction prohibits using chemical munitions only when: (1) the chemicals are "likely to reach Gray's Landing," and (2) the munitions are not "determined to be necessary to address an imminent threat to life." ER-059.

**A.** DHS's own statements and conduct show that the injunction is workable and does not prevent DHS from using less-lethal munitions to protect officers or the ICE facility. The injunction does not force agents to develop "a mastery of meteorology" and perform "complex calculation[s]" while "making split-second judgments." Br. 35–36 (citation omitted).

The government's brief, relying on DHS officers' declarations and testimony, shows that DHS understands the precise impact ranges on the various types of munitions. "OC [*i.e.*, pepper spray] can reach up to 20 feet when dispersed in an aerosolized format and up to six feet when released as

70

dust from breakable pepper balls." Br. 5 (citing ER-012–13). "PAVA (synthetic OC) can reach up to 15 feet from where deployed and 300 feet from a compressed air launcher or PepperBall Launching System." *Id.* (citing ER-013). Officers thus can know with confidence that these munitions are not "likely to reach Gray's Landing" when deployed in and around the ICE facility's driveway to repel or clear protesters. In contrast, using long-range projectile launchers to shoot chemical munitions toward Gray's Landing would be prohibited.

DHS also understands tear gas (*i.e.*, CS gas) has a far wider dispersal radius. CS forms a traveling "gas cloud," ER-013, which can result in "area saturation" and "can impact up to 450 feet" when shot via a launcher. ER-082 ¶¶ 9–10. Any DHS officer should reasonably know that tear gas released within 100 feet of Gray's Landing is "likely to reach" the complex, absent some unique circumstances making clear that it will not. And officers certainly know that when they deploy tear gas down the block from the ICE facility and *immediately next to* Gray's Landing—as the district court found they have done repeatedly—the gas will hit the complex. *E.g.*, ER-017, ER-024–26, ER-047–49.

71

It bears emphasis, moreover, that DHS's uses of chemical munitions outside the ICE facility are *not* "split-second judgments." *Contra* Br. 36 (citation omitted). The district court found that the challenged deployments are the product of premeditated operational choice, with ample time to reevaluate and revise tactics over the course of repeated incidents, rather than a single rapidly escalating confrontation demanding instantaneous reaction. ER-046–50. Officers deployed chemical munitions on many dozens of days over eight months in recurring, anticipated fact patterns. ER-014–27 & n.12. They even deployed tear gas *85 times* in a single evening. ER-047–49.

**B.** The government claims the injunction is also not workable because it precludes uses necessary "to protect officer and public safety," and will force officers into more dangerous confrontations. Br. 39.

FPS's practices show the government is wrong. As described, "FPS does not authorize its officers to use munitions containing CS," ER-013, and a senior FPS official testified that FPS officers "don't employ anything [*e.g.*, OC spray, pepperballs, PAVA] down on Moody [or] … Bancroft"; "we don't go up to either intersection." ER-044. FPS instead focuses on protecting against immediate threats to the ICE facility and its inhabitants, by using certain less-lethal munitions to repel protesters from ICE property, including the ICE

72

driveway. *See id.* The district court's injunction does not affect FPS's self-described practices in *any* way. That alone refutes the notion that the injunction jeopardizes protection capabilities.

Indeed, the government's force-escalation theory is entirely speculative and unsupported by the record. It points to no incident during 38 days of operating under chemical-munitions restrictions from injunctions in which officers were forced into a more dangerous confrontation or required to resort to more force. And the injunction includes a reasonable exception to protect the lives of law enforcement officers and others. ER-059.

That exception is not, as the government contends (at 40–41), a Fourth Amendment transplant; it is the district court's calibration of the remedy to the constitutional violation. It provides Plaintiffs with "complete relief" against additional grievous injuries without unnecessarily constraining law enforcement officers in the exercise of their duties. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

**C.** Finally, the government's separation-of-powers argument (at 41–42) conflates enforcing constitutional limits with superintending executive operations. Courts can, and often do, enjoin unconstitutional executive conduct. That is a core function of Article III, not a transgression of it. Thus,

this Court regularly upholds preliminary injunctions restricting federal law-enforcement practices—including federal officers' use of force during protests—where constitutional violations are established. *See, e.g.*, *Index Newspapers*, 977 F.3d at 838.

## IV. The Equities and the Public Interest Favor Plaintiffs

The equities and public interest overwhelmingly favor Plaintiffs. The public has no interest in its government engaging in conscience-shocking conduct. It has no interest in federal officers knowingly and repeatedly releasing poison gas into the apartments of hundreds of vulnerable people, placing them at risk of serious short- and long-term harm.

The government repeatedly states that DHS has used tear gas and other chemical munitions to disperse "violent, disruptive, or unlawful protests." *E.g.*, Br. 1, 35, 37, 38, 40, 42–43. But it simply ignores the many incidents where video evidence shows, and the district court found, that DHS deployed chemical munitions against non-violent protesters who presented no risk of harm to law enforcement or others. ER-014–27; *e.g.*, Exs. 2, 19, 44, 46, 55–57.[49]

---

[49] https://www.youtube.com/playlist?list=PLZZGlWOJfMoKqIGj57J_TvLfa m5rak5aN

That is not to mention the undisputed incidents of exposing Plaintiffs to tear gas to facilitate social media propaganda.

The government ignores the record and instead rests on speculation and abstract law-enforcement interests. *See* Br. 42–43. But DHS identifies no incident in which the injunction prevented officers from protecting themselves, the facility, or the public. Generalized assertions of law-enforcement harm, unsupported by concrete evidence, cannot overcome Plaintiffs' documented risk of serious constitutional injury. *See Index Newspapers*, 977 F.3d at 837–38. The equities and public interest overwhelmingly support affirmance.

## CONCLUSION

The Court should affirm the preliminary injunction.

Respectfully Submitted,

*/s/ Stephen K. Wirth*
Daniel F. Jacobson
Lynn D. Eisenberg
Stephen K. Wirth
Brian C. Rosen-Shaud
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave., NW, Suite 301
Washington, DC 20016
(301) 615-2336
dan@jacobsonlawyersgroup.com

75

Brian D. Netter
Jeffrey B. Dubner
Anna L. Deffebach
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043

Katie Schwartzmann
PROTECT DEMOCRACY
201 St. Charles Ave., Suite 114
New Orleans, LA 70170

Darin M. Sands
Colin Hunter
BRADLEY BERNSTEIN SANDS LLP
1211 NW Glisan St., Suite 204
Portland, OR 97209

Taylor Jaszewski
BRADLEY BERNSTEIN SANDS LLP
1212 Broadway, Suite 1100
Oakland, CA 94612

*Counsel for Plaintiffs-Appellees*

May 18, 2026

76

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 26-1575

I am the attorney or self-represented party.

**This brief contains** | 13,995 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Stephen K. Wirth | **Date** | May 18, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*