**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

REACH COMMUNITY DEVELOPMENT; WHITFIELD TAYLOR, individually and as Parent and Next Friend of Minor Children A.T. and B.T; MINDY KING; SUSAN DOOLEY; JANICE LINEBERGER; JANE DOE; REBECCA ROE; REACH B49 PARTNERS, LP; REACH OFFICE, LLC; DIANE MORENO; ERICA DEL NIGRO, individually and as Parent and Next Friend of Minor Child J.D.; ROY BROOKS,

*Plaintiffs - Appellees*,

SHAE ANDERSON,

*Plaintiff*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; UNITED STATES IMMIGRATION AND

No. 26-1575

D.C. No. 3:25-cv-02257-AB

OPINION

CUSTOMS ENFORCEMENT; DAVID J. VENTURELLA, in his official capacity as Acting Director of ICE; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as the Commissioner of CBP; FEDERAL PROTECTIVE SERVICE; FARON PARAMORE, in his official capacity as the Director of FPS; UNITED STATES SECRET SERVICE; SEAN M. CURRAN, in his official capacity as Director of the Secret Service,

*Defendants - Appellants*.

Appeal from the United States District Court
for the District of Oregon
Amy M. Baggio, District Judge, Presiding

Argued and Submitted July 10, 2026
Pasadena, California

Filed November 10, 2026

Before: Kenneth K. Lee, Ana de Alba, and Eric C. Tung, Circuit Judges.

Opinion by Judge Tung;
Dissent by Judge de Alba

## SUMMARY*

### Preliminary Injunction / Constitutional Rights

The panel vacated the district court's preliminary injunction enjoining several federal agencies from deploying tear gas to disperse demonstrators gathered outside a U.S. Immigration and Customs Enforcement (ICE) facility in Portland, Oregon.

In a prior order, the panel granted the government's motion to stay the district court's preliminary injunction pending appeal, holding that tenants of an apartment complex, located across the street from the government facility, lacked a substantive-due-process right to be free from exposure to chemicals that were released when federal law enforcement officers used tear gas to disperse crowds. On appeal from the preliminary injunction order itself, the panel reaffirmed that holding.

The panel held that the plaintiffs have no likelihood of success on the merits because they lack a substantive-due-process right to be free from the government's use of non-lethal crowd-control devices in response to disruptive demonstrations. Neither the district court nor the plaintiffs provided any indication that the substantive-due-process right they claim is to be found in the constitutional text or structure or is deeply rooted in the nation's history and tradition. Because the district court failed to anchor the

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

claimed right in any history or tradition, its analysis was flawed.

The panel rejected the plaintiffs' argument that they need not show that the conduct violates a right deeply rooted in the nation's history, so long as the challenged conduct "shocks the conscience." To succeed on a substantive-due-process challenge to executive action, a plaintiff must show both that the action shocks the conscience and that the action deprives a right that, carefully described, is deeply rooted in the nation's history and implicit in the concept of ordered liberty, consistent with the Supreme Court's teachings in *Washington v. Glucksberg*, 521 U.S. 702 (1997) and *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). Because the plaintiffs fail to satisfy the historical inquiry, the panel did not need to decide whether the government's conduct shocks the conscience.

Dissenting, Judge de Alba wrote that the majority too easily declares both the shocks-the-conscience standard and the fundamental-rights standard as applicable in executive-action cases. She would apply the shocks-the-conscience standard alone and hold that the district court properly determined that the plaintiffs are likely to succeed on the merits of their Fifth Amendment substantive-due-process claim.

## COUNSEL

Stephen K. Wirth (argued), Brian C. Rosen-Shaud, Daniel F. Jacobson, and Lynn D. Eisenberg, Jacobson Lawyers Group PLLC, Washington, D.C.; Katharine Schwartzmann, Protect Democracy, New Orleans, Louisiana; Darin M. Sands and Colin H. Hunter, Bradley Bernstein Sands LLP, Portland, Oregon; Taylor Jaszewski, Bradley Bernstein Sands LLP, Oakland, California; Brian D. Netter, Jeffrey B. Dubner, and Anna L. Deffebach, Democracy Forward Foundation, Washington, D.C.; for Plaintiffs-Appellees.

Brenna H. Scully (argued), Mark R. Freeman, and August E. Flentje, Attorneys, Appellate Staff; Eric D. McArthur, Deputy Assistant Attorney General; Brett A. Shumate, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

---

## OPINION

TUNG, Circuit Judge:

A few months ago, we granted a stay of a preliminary injunction that the district court issued against the federal government. The injunction prohibited several federal agencies from deploying tear gas, a common crowd-dispersal tool, in response to hundreds of demonstrators descending upon an Immigration Customs Enforcement facility in Portland, Oregon, and causing acts of lawlessness, including assaulting federal officers, and vandalizing and trespassing upon federal property. *Reach Community Development v. United States Dep't of Homeland Security*,

174 F.4th 1143, 1145 (9th Cir. 2026). We held that, contrary to the district court's ruling, tenants of an apartment complex, located across the street from the government facility, lacked a substantive-due-process right to be free from being exposed to gas that wafted over to their complex. *Id.* at 1146–47. Now on appeal from the preliminary injunction order itself, we reaffirm that holding.

## I.

The facts of this case were discussed in our prior order, and we do not repeat them here. No new facts or changes in the record have been alleged since our ruling on the stay motion. The matter here turns on a question of law—whether there is a substantive-due-process right not to be exposed to chemicals from the government's use of non-lethal crowd-control devices. We address that question below.

## II.

The standard for issuing a preliminary injunction is well known. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (emphasis added). We "review an order regarding preliminary injunctive relief for abuse of discretion, but review any underlying issues of law de novo." *Norbert v. City & County of San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021) (citation omitted). If we find that there is no likelihood of success on the merits, we can end our inquiry there and vacate the preliminary injunction. *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) ("Likelihood of

success on the merits is 'the most important' factor; if a movant fails to meet this 'threshold inquiry,' we need not consider the other factors.") (citation omitted). In this posture, too, we need not address standing before disposing of the matter on the merits. *See Mullin v. Doe*, 609 U.S. 324, 346 (2026) (plurality opinion) ("[W]e may reverse the District Court's grant of interim relief on either jurisdictional or merits grounds.").

## III.

The district court's preliminary injunction must be vacated because Plaintiffs have no likelihood of success on the merits. Simply put, Plaintiffs lack a substantive-due-process right to be free from the government's use of non-lethal crowd-control devices in response to disruptive demonstrations.

In our stay order, we held that "any claimed 'right' not mentioned in the Constitution must be 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'" *Reach*, 174 F.4th at 1147 (quoting *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2022)). Here, Plaintiffs "have not pointed to any historical prohibition—much less a 'deeply rooted' one—against the use of non-lethal crowd-control devices by law enforcement." *Id.* "To the contrary," we said, "such devices have long been a common tool of law enforcement to disperse crowds that have turned disruptive and violent." *Id.* As far as we were aware, "'no federal or state court' has recognized the Plaintiffs' claimed right." *Id.* (quoting *Dobbs*, 597 U.S. at 241). "Nor have the parties pointed us to 'any scholarly treatise' that would support such a right." *Id.* Thus, we concluded that the alleged right "does not appear to exist." *Id.* Before us again on appeal, Plaintiffs

have not unearthed any new historical material to dislodge our earlier conclusion.

We also concluded that the district court's analysis was flawed. *Id.* at 1148. While the district court claimed to follow *Glucksberg*'s command that it must provide a "careful description" of the right, it failed to anchor that right "in any history or tradition." *Id.* As we explained, one "must first carefully describe the right, and then determine whether that right is historically rooted." *Id.* (citing *Washington v. Glucksberg*, 521 U.S. 702, 724 (1997)). "One cannot simply pluck a 'right' as general and abstract as 'bodily integrity' from the caselaw, and then carefully describe that right on one's own terms without regard to whether that right is in fact grounded in history." *Id.* Otherwise, we said, "*Glucksberg* and *Dobbs* would have easily come out the other way if the district court's analysis were followed[.]" *Id.* None of the cases cited by the district court or Plaintiffs establishes a right to be free from exposure to tear-gas chemicals used by law enforcement officers as a means of crowd control. *See Guertin v. Michigan*, 912 F.3d 907, 918–22 (6th Cir. 2019); *Washington v. Housing Authority of the City of Columbia*, 58 F.4th 170, 177–82 (4th Cir. 2023); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006); *Hess v. Garcia*, 72 F.4th 753, 765 (7th Cir. 2023). We also rejected Plaintiffs' request for us to "find an unwritten constitutional right (against the use of such devices) that is possessed not by the direct targets of the government action (such as the crowds) but by the neighboring residents who may be incidentally affected by that action." *Reach*, 174 F.4th at 1147. We concluded that "Plaintiffs' approach would transform the Constitution into 'a font of tort law,'' and we "refuse[d] to accept their invitation to do so here." *Id.* (citation omitted).

We reaffirm those conclusions here and vacate the district court's preliminary injunction. Plaintiffs raise a new argument on appeal (one they did not present to the district court or to us during the stay proceedings), but it fails all the same. Rather than salvage their (and the district court's) defective argument that the asserted right is historically rooted, Plaintiffs now argue that they never needed to make that showing. So long as the challenged conduct "shocks the conscience," they say, they need not show that the conduct violates a right deeply rooted in our history.

That argument is wrong. *Glucksberg* and *Dobbs* make amply clear that, to prevail on a substantive-due-process claim, a plaintiff must show that the asserted right, carefully described, is deeply rooted in our Nation's history. *Dobbs*, 597 U.S. at 231; *Glucksberg*, 521 U.S. at 721. To get around this precedent, Plaintiffs assert that challenges to *executive* action—as opposed to *legislative* action—are different, citing *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), and concluding from that case that challenges to the former need not satisfy *Glucksberg* while challenges to the latter do. To be sure, *Lewis* distinguished between executive and legislative action but concluded that plaintiffs have a *heavier* burden in challenging executive action than legislative action. *See id.* at 847 n.8; *see also Browder v. City of Albuquerque*, 787 F.3d 1076, 1079 n.1 (10th Cir. 2015) (Gorsuch, J.) ("*Lewis* indicated that its standard for executive conduct is intended to be even more demanding than the *Glucksberg* standard for legislative action."). *Lewis* instructed that, to prevail on a substantive-due-process challenge to executive action, the plaintiff must show *both* that the action "shocks the conscience" *and* that the action deprives him of a right deeply rooted in our Nation's history. 523 U.S. at 847 n.8. *Lewis* repeatedly described the "shocks

the conscience" standard as an "antecedent" or "threshold" issue: "[o]nly if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action[.]" *Id.* Contrary to Plaintiffs' view, then, *Lewis* did not dispense with *Glucksberg*.

Our court has so held. In *Brittain v. Hansen*, we held that "[i]t is not enough to allege conscience shocking action" to establish a substantive-due-process claim challenging executive action. 451 F.3d 982, 991 (9th Cir. 2006). We made clear that "to establish a constitutional violation based on substantive due process, [the plaintiff] must show both a deprivation of her liberty *and* conscience shocking behavior by the government." *Id.* (emphasis added).

Some of our cases have described the shocks-the-conscience test as if it is an independent path to prove a due-process violation, *Glucksberg* notwithstanding. *See*, *e.g.*, *Regino v. Staley*, 133 F.4th 951, 960 n.5 (9th Cir. 2025); *Martinez v. City of Oxnard*, 337 F.3d 1091, 1092 (9th Cir. 2003) (per curiam); *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000). But none of those cases held that the test set forth in *Glucksberg* and *Dobbs* does not govern. The strongest case for Plaintiffs (*Regino*)—loosely describing in a footnote the shocks-the-conscience test and the fundamental-rights test as alternative tests—expressly declined to address the applicability of the shocks-the-conscience test. 133 F.4th at 960 n.5 ("[W]e do not address the shocks-the-conscience standard and express no opinion on its applicability."). That case thus does not control our disposition here.

We make clear today what we already held in *Brittain*: to succeed on a substantive-due-process challenge to executive action, a plaintiff must show both that the action

shocks the conscience and that the action deprives a right that, carefully described, is deeply rooted in our Nation's history and implicit in the concept of ordered liberty, consistent with the Supreme Court's teachings in *Glucksberg* and *Dobbs*.

Plaintiffs acknowledge (as they must) that they must prove a deprivation of their "liberty"—not just executive conduct that "shocks the conscience." *See*, *e.g.*, Ans. Br. 28 ("Because Plaintiffs challenge executive conduct, not legislation, the shocks-the-conscience test applies, under which Plaintiffs must demonstrate conscience-shocking conduct that *burdens a liberty interest*.") (emphasis added). Yet in determining what "liberty" is, Plaintiffs would not apply *Glucksberg* and *Dobbs*. Instead, Plaintiffs apparently would apply an ahistorical test that, in the end, is dependent on what judges believe should be recognized as a "liberty interest." *Glucksberg* and *Dobbs* squarely rejected that approach. Plaintiffs' position would, bizarrely, set up a two-tiered analysis of whether "liberty" is at stake—one for executive actions; another for legislative actions. Nothing justifies this view.

Plaintiffs' view, if accepted, would bring back the "freewheeling judicial policymaking" that *Glucksberg* and *Dobbs* put to an end. *Dobbs*, 597 U.S. at 240. A shocks-the-conscience test without any anchor in longstanding history is an open invitation for courts to make up law—one judge's expectation is another judge's shock. *See Lewis*, 523 U.S. at 865 (Scalia, J., concurring in the judgment) ("[F]or judges to overrule [a] democratically adopted policy judgment on the ground that it shocks *their* consciences is not judicial review but judicial governance."). We "must not fall prey to such an unprincipled approach." *Dobbs*, 597 U.S. at 240. "Instead, guided by the history and tradition that map the

essential components of our Nation's concept of ordered liberty, we must ask what the [Constitution] means by the term 'liberty.'" *Id.* Here the due-process clause does not protect a right to be free from exposure to gases released from the government's deployment of non-lethal crowd-control devices in response to disruptive crowds.

The dissent's points do not persuade. The dissent contends that *Lewis* "suggests" that a shocks-the-conscience test (without inquiring into history) "*might*" be enough. Dissent at 17 (emphasis in original). To the extent the conduct at issue *fails* to shock the conscience, we agree that (under our precedents) a court can *deny* a substantive-due-process challenge to executive action without looking to history. But nowhere did *Lewis* suggest that a plaintiff can *succeed* on such a claim without showing that the liberty purportedly denied was deeply rooted in our history and tradition; indeed, *Lewis* said the opposite. *See supra* at 9–10.

The dissent does not dispute that at least one precedent of this court, consistent with *Lewis*, requires plaintiffs to show *both* a deprivation of liberty and conscience-shocking action. Dissent at 19 (citing *Brittain*, 451 F.3d at 991). Yet the dissent expressly (and remarkably) refuses to follow that precedent. The dissent argues that another case (*Martinez*) held that conscience-shocking conduct alone was enough to find a substantive-due-process violation; that *Martinez* and *Brittain* "are in conflict"; and that *Martinez* controls over *Brittain* because *Martinez* "ha[d] successfully posed as the law of the circuit for long enough to be relied on." Dissent at 20 (quoting *United States v. Hardesty*, 958 F.2d 910, 912 (9th Cir. 1992), *superseded in part*, 977 F.2d 1347, 1348 (9th Cir. 1992) (en banc)).

This is incorrect. There is no conflict. *Martinez* did not address whether the plaintiff's asserted right needed to be deeply rooted in our nation's history or tradition (as *Glucksberg* instructs)—the issue we decide here. *See United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022) ("Prior precedent that does not squarely address a particular issue does not bind later panels on the question" (internal quotation marks omitted)). In *Martinez*, the court said that the "Due Process Clause protects individuals from state action that either shocks the conscience or interferes with rights implicit in the concept of ordered liberty." Dissent at 19 (quoting *Martinez*, 337 F.3d at 1092). But nowhere does *Martinez* mention (much less address) a historical inquiry or *Glucksberg*; it mentions only "ordered liberty," a *separate* component of the due-process analysis. *See Dobbs*, 597 U.S. at 231, 237 ("[T]he Court has long asked whether the right is 'deeply rooted in [our] history and tradition *and* whether it is essential to our Nation's 'scheme of ordered liberty.'" (emphasis added) (citations omitted)).[1]

*Dobbs*, reaffirming *Glucksberg*, makes clear that the "historical inquir[y]" is "essential": a court cannot "recognize a new component of the 'liberty' protected by the Due Process Clause" without reference to history "because the term 'liberty' alone provides little guidance." *Dobbs*, 597 U.S. at 239. *Brittain*, prefiguring *Dobbs*, expressly applied the *Glucksberg* test and thus binds us.

[1] The dissent also cites *Estate of Soakai v. Abdelaziz*, 137 F.4th 969 (9th Cir. 2025), for the proposition that *Glucksberg*'s historical inquiry does not apply. Dissent at 20. But the case does not say that. It applied a shocks-the-conscience standard without addressing *Glucksberg* or history. We are thus not bound by it.

The dissent does not even try to satisfy that test. It cannot. As discussed, the purported right to be free from exposure to gases released from non-lethal crowd-control devices in response to disruptive crowds is not deeply rooted in our nation's history or tradition. *Reach*, 174 F.4th at 1147. The dissent proceeds instead to recite facts that purport to demonstrate the conscience-shocking nature of the government's conduct. We need not decide whether that is so, since Plaintiffs fail to satisfy the historical inquiry. We only observe that the dissent fails to include the facts that appear to have prompted the use of the devices in the first place: members of the crowd barricaded federal officers inside the facility, ER-66; set federal property on fire and destroyed facility cameras, ER-70, 100–02; threw rocks, glass, and metal at officers, ER-99–100, 127; and targeted federal agents' eyes with high-powered lasers capable of causing permanent damage, ER-148–59. A proper shocks-the-conscience inquiry must account for those facts. The deployment of non-lethal crowd-control devices to prevent violence from escalating and to protect federal property does not appear to us to shock the conscience.

* * *

Plaintiffs ask us to recognize a substantive-due-process right that no court or other authority (except the district court here) has recognized before. *Dobbs* forecloses our doing so. That case reflects the Supreme Court's most recent, thorough explication of the limited scope of substantive-due-process rights and how those rights, carefully described, must find longstanding support in our nation's history. They cannot be founded on general and abstractly formulated propositions such as the right to "bodily integrity." Yet *nowhere* in the Plaintiffs' briefs—or in the district court's opinion—is *Dobbs* ever mentioned. That omission tells us

much. Plaintiffs would return us to a time before *Glucksberg* and *Dobbs* were decided, when *Roe v. Wade* put judges in the position of creating new rights rather than securing those rights established or recognized by our Constitution, when judges devised extra-constitutional rules that overrode legislative acts authorized by the will of the people or invalidated law-enforcement action long understood to be permissible. That we cannot do. The district court's preliminary injunction is vacated.

**PRELIMINARY INJUNCTION VACATED.**

---

de Alba, Circuit Judge, dissenting:

In my view, the majority too easily declares both the shocks-the-conscience standard and the fundamental-rights standard as applicable in executive-action cases. As discussed below, the Supreme Court's and our decisions are not so straightforward on the question of what standard we should apply in such cases. Yet an exploration of the relevant authorities leads me to conclude that we should apply the shocks-the-conscience standard alone to determine whether substantive-due-process rights were violated in executive-action cases.

## I.

The district court properly determined that Plaintiffs are likely to succeed on the merits of their Fifth Amendment substantive-due-process claim. We have noted that there are "two different legal standards to substantive due process claims"—a "fundamental rights" standard and a "shocks the conscience" standard. *Regino v. Staley*, 133 F.4th 951, 960 n.5 (9th Cir. 2025). The majority opinion describes the

fundamental-rights standard. Under the shocks-the-conscience standard, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citation modified). "While the measure of what is conscience shocking is no calibrated yard stick, it does . . . point the way." *Id.* at 847 (citation modified). That said, "[h]istorically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property," i.e., "conduct intended to injure in some way unjustifiable by any government interest." *Id.* at 849 (citation modified). The guarantee of due process does not apply to the "traditional category of common-law fault" and "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Id.* at 848 (citation modified); *see also id.* at 849 ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").

In between deliberate conduct and negligent conduct is "the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence." *Id.* at 849 (citation modified). This middle range "is a matter for closer calls," although the Supreme Court has determined that, for example, "deliberately indifferent conduct," depending on the circumstance, "must also be enough to satisfy the fault requirement for due process claims." *Id.* at 849–50 (footnote omitted); *see also id.* at 849–53 (explaining that deliberate indifference may shock the conscience in the pretrial custody context—e.g., when a pretrial detainee is denied medical needs while awaiting trial—but may be "less egregious" in the context of "high-speed law enforcement chases" and "a

prison riot" when officers "are supposed to act decisively" rather than deliberately). Ultimately, what shocks the conscience "is less a matter of rule," and an asserted denial of constitutional due process "is to be tested by an appraisal of the totality of facts in a given case." *Id.* at 850 (citation modified).

The parties dispute which standard applies. Whether the fundamental-rights standard and/or the shocks-the-conscience standard applies depends "on whether it is legislation or a specific act of a governmental officer that is at issue." *Id.* at 846. In cases dealing with legislative action, the fundamental-rights standard applies. *Id.* In cases dealing with executive action, the shocks-the-conscience standard applies, *id.*, although it is less clear whether the fundamental-rights standard also applies or can be applied in the alternative.

The parties agree that this is an executive-action case and that the shocks-the-conscience standard applies; however, they disagree on whether the shocks-the-conscience standard alone applies (as Plaintiffs contend) or whether both the shocks-the-conscience standard *and* the fundamental-rights standard apply (as the government contends).

Notably, *Lewis* suggests—without deciding—that meeting the shocks-the-conscience standard alone *might* be sufficient in an executive-action case. *See id.* at 847 n.8 ("Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action, and only then might there be a debate about the sufficiency of historical examples of enforcement of the right claimed, or its recognition in other ways. *In none of*

*our prior cases have we considered the necessity for such examples, and no such question is raised in this case*.") (emphasis added); *see also id.* at 861 (Scalia, J., concurring in the judgement) ("According to today's opinion, [the shocks-the-conscience test] is the measure of arbitrariness when what is at issue is executive, rather than legislative, action.").

At the same time, *Lewis* states that "a case challenging executive action on substantive due process grounds, like this one, presents an issue *antecedent* to any question about the need for historical examples of enforcing a liberty interest of the sort claimed," and that "the *threshold question*" in such a case is whether the executive action shocks the conscience. *Id.* (emphases added). Although the majority interprets this language to mean that both the shocks-the-conscience standard and the fundamental-rights standard apply to executive-action cases, that is not what the Court said in *Lewis*. It merely noted that "any question" about whether the fundamental-rights standard applies would follow the application of the shocks-the-conscience standard. Indeed, as stated above, *Lewis* underscored that "[i]n none of our prior cases have we considered the necessity" of applying the fundamental-rights standard to executive-action cases "and no such question is raised in this case." *Id.*

Following *Lewis*, Justice Thomas—writing for a three-justice plurality in *Chavez v. Martinez*—applied both the shocks-the-conscience standard and fundamental-rights standard in an executive-action case. 538 U.S. 760 (2003). The plurality concluded that the executive conduct was not "conscience shocking." *Id.* at 774–75 (citation modified). Instead of ending the analysis there, the plurality turned to a fundamental-rights analysis and declined to recognize a new

fundamental liberty interest in the case. *Id.* at 775–76. "That certainly makes it *seem* like the plurality thought that a substantive-due-process violation could be shown either way—by conscience-shocking conduct *or* by infringement of a fundamental right." *Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*, 132 F.4th 1232, 1285 (11th Cir. 2025) (Newsom, J., concurring), *cert. denied*, 146 S. Ct. 2608 (2026).

Then, on remand from *Chavez*, in *Martinez v. City of Oxnard*, the Ninth Circuit concluded that the "Due Process Clause protects individuals from state action that *either* shocks the conscience *or* interferes with rights implicit in the concept of ordered liberty." 337 F.3d 1091, 1092 (9th Cir. 2003) (per curiam) (citation modified). In other words, this court adopted the Supreme Court plurality's suggestion that a substantive-due-process violation could be shown through *either* conscience-shocking conduct *or* by infringement of a fundamental right.

Yet, following *Martinez*, in *Brittain v. Hansen*, we concluded, "It is not enough to allege conscience shocking action" because "there is no general liberty interest in being free from capricious government action." 451 F.3d 982, 991 (9th Cir. 2006) (citation modified). Accordingly, "in order to establish a constitutional violation based on substantive due process, [a plaintiff] must show both a deprivation of [their] liberty and conscience shocking behavior by the government." *Id.* (footnote omitted).

*Martinez* and *Brittain* are in conflict.[1] "Normally, when faced with an irreconcilable intra-circuit conflict of this

[1] The majority's position to the contrary notwithstanding, *Martinez*, following *Chavez*, explicitly stated a standard for evaluating questions arising under the Due Process Clause, and I view that standard as binding. *Cf. Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) ("[S]ince

nature, the proper course would be to cal[l] for an en banc panel to resolve the conflict." *United States v. Hardesty*, 958 F.2d 910, 912 (9th Cir. 1992) (citing *Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477, 1478–79 (9th Cir. 1987) (en banc)). Such a call, however, "is not required where . . . the conflict may be reconciled or avoided." *Id.* Moreover, "we have also found it appropriate to follow one of two conflicting lines of authority without calling for en banc review." *Id.* This is the case when "Congress has undermined one of the conflicting cases by amending a substantive statute" or "we are asked to make the unsatisfactory choice between two opposing lines of authority, neither of which has an unimpaired claim to being the law of the circuit without the aid of an intervening decision by Congress or the Supreme Court." *Id.* (citation modified). In the latter situation, "a panel may follow the rule which has successfully posed as the law of the circuit for long enough to be relied upon." *Id.* (citation modified).

Here, we have applied the shocks-the-conscience standard, rather than the fundamental-rights standard, in numerous executive-action cases post-dating *Lewis*, *Martinez*, and *Brittain*. *See, e.g.*, *Estate of Soakai v. Abdelaziz*, 137 F.4th 969, 976–80 (9th Cir. 2025) (applying the shocks-the-conscience standard only and holding that the plaintiffs "have stated a substantive due process claim by plausibly alleging that they, as bystanders, were injured when [the defendants] engaged in a high-speed chase for the

---

we have never squarely addressed the issue, and have *at most assumed* the applicability of the *Chapman* standard on habeas, we are free to address the issue on the merits." (emphasis added)); *United States v. Kirilyuk*, 29 F.4th 1128, 1134 (9th Cir. 2022) (concluding that cases are "not precedential for propositions not considered" or matters that are "simply assumed" (citation modified)).

purpose of harming the fleeing suspect without a legitimate law enforcement objective"). In this case, we should follow suit and apply the shocks-the-conscience standard alone.[2] *See Hardesty*, 958 F.2d at 912. Indeed, this is the better approach. As Tenth Circuit Judge Timothy M. Tymkovich explained, "[T]he fundamental-rights test is ill suited to evaluating particular conduct. That test is quintessentially one for legislation, not executive acts." Timothy M. Tymkovich et al., *A Workable Substantive Due Process*, 95

---

[2] I do not address the fundamental-rights question on the merits because I do not think it applies here. I note, however, that although the majority places great emphasis on *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), the Supreme Court has not consistently applied the standard articulated in *Washington v. Glucksberg*, 521 U.S. 702 (1997). *See, e.g.*, *Obergefell v. Hodges*, 576 U.S. 644, 671 (2015).

In fact, earlier this year, the Supreme Court vacated the Ninth Circuit's order staying a preliminary injunction on behalf of, among others, parents who claimed that, in relevant part, certain California policies violated the Fourteenth Amendment's Due Process Clause because they prevented schools from telling parents about their children's efforts to engage in gender transitioning at school unless the children consented to parental notification. *Mirabelli v. Bonta*, 607 U.S. 492, 492–93 (2026). The Court concluded that the parents had a likelihood of success on the merits, even though the Due Process Clause "does not expressly grant parental rights of any kind" and members of the Supreme Court have "expressed skepticism—sometimes outright hostility—to understanding the 'capacious' term 'liberty' to enshrine specific rights." *Id.* at 505 (Kagan, J., dissenting) (quoting *Dobbs*, 597 U.S. at 239).

Indeed, "given the Court's last venture into the field, [the Court's decision in *Mirabelli*] cannot but induce a strong sense of whiplash." *Mirabelli*, 607 U.S. at 505 (Kagan, J., dissenting) (*comparing Mirabelli*, 607 U.S. at 497 (recognizing a parent's decisions about her child's health), *with Dobbs*, 597 U.S. at 231 (repudiating a woman's right to make important decisions about her own health)).

NOTRE DAME L. REV. 1961, 2000 (2020). The test "asks whether a right is fundamental, and if so, whether the government's interference is narrowly tailored to effect a compelling interest." *Id.* Yet "[o]fficers' actions on a given day are subject to all sorts of outside factors" and "those intangible factors are square pegs to the round holes of 'compelling interest' and 'narrow tailoring.'" *Id.*

## II.

The district court properly determined that Plaintiffs met the shocks-the-conscience standard. The executive conduct in question determines the appropriate analytical approach. "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citation modified). "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives," such as using force to bully a suspect or "get even." *Id.* (citation modified).

Here, the deliberate-indifference test applies as the government often had time to deliberate before using chemical munitions. The district court found that, while federal officers may have made certain snap-judgment decisions, they had "ample time" to deliberate before deploying chemical munitions and that the record reflects that the officers engaged in "eight months of planning, patterned operations, and inter-agency coordination." *Reach Cmty. Dev. v. U.S. Dep't of Homeland Sec.*, 822 F. Supp. 3d 1186, 1214–15 (D. Or. 2026).

Various factors support the district court's deliberate-indifference finding, including the distance from the Portland ICE facility to the chemical munitions impact areas, the quantity of chemical munitions federal officers used and their indiscriminate and pre-planned use, that chemical munitions were used contrary to agency use-of-force policies, and that the government knew its use of chemical munitions harmed Plaintiffs.

Taking each of these factors in turn, the Portland ICE facility was often a significant distance away from the chemical munitions impact areas. Indeed, the district court found that there was "widespread deployment of chemical munitions," including "spent munitions located in the Gray's Landing courtyard, which [is over 100 feet away from the Portland ICE facility and] offers an outdoor recreation area and children's play area," and chemical munition deployment one or more blocks away from the Portland ICE Facility, without indication of a legitimate law enforcement purpose for the use of force in those areas. *Id.* at 1215.

Although the government argues that it did not know the impact ranges of its chemical munitions, the government spells out likely impact ranges for the chemical munitions in its own briefing: "OC [i.e., pepper spray] can reach up to 20 feet when dispersed in an aerosolized format and up to six feet when released as dust from breakable pepper balls"; and PAVA (synthetic OC) "can reach up to 15 feet from where deployed and 300 feet from a compressed air launcher or PepperBall Launching System." The government is also aware that tear gas (or CS) forms a "gas cloud" that can result in "area saturation" and "impact up to 450 feet" when shot using a launcher.

The quantity of chemical munitions used was also significant and such use was often indiscriminate and pre-planned. The district court highlighted several incidents indicating such use which bear repeating. First, on the evening of October 4, 2025, federal officers deployed "large amounts" of chemical munitions "a full one-and-a-half to two blocks away from the Portland ICE Facility" and "in front of" Gray's Landing. *Id.* at 1217. The officers had pushed protesters down the street for about ten minutes before launching the chemical munitions at the protesters. A journalist from Oregon Public Broadcasting who was on scene stated, "It wasn't clear what the crowds did to provoke this." Thick chemical gas clouds then entered Gray's Landing, which caused Plaintiffs "serious adverse [health] effects." *Id.* at 1200. As the district court explained, "This conduct of a coordinated, organized[] operation in which Defendants deployed significant quantities of chemical munitions on a group of people over a block from the Portland ICE Facility and in front of a large residential apartment building is in and of itself troubling, but there is more." *Id.* at 1217.

Namely, on October 6 and 7, 2025, the U.S. Department of Homeland Security "posted short videos to its Instagram account," which contain footage of large gas clouds blocks away from the Portland ICE facility. *Id.* One of the videos showed gas covering Gray's Landing. Plaintiffs represent that this footage is from the evening of October 4, 2025, and that federal officers deployed the chemical munitions depicted in the videos in furtherance of social media content creation, not any legitimate law enforcement purpose. *See id.* at 1217–18. The government has not denied that the footage is from the evening of October 4, 2025, or that the

government deployed chemical munitions for the purpose of social media content creation.

In fact, the record reflects that, as federal officers moved protesters hundreds of feet down the street from the Portland ICE facility, they were "flanked by videographers toting professional equipment and wearing high-visibility vests." The record also reflects that some social media influencers were perched on the roof of the Portland ICE facility where they documented the events of October 4, 2025.[3]

Second, in the afternoon on October 4, 2025, an officer launched a chemical munition in the direction of Plaintiff Mindy King who was filming federal officers from her balcony. The chemical munition traveled "approximately 150 feet away [from the Portland ICE facility and] toward [ ] King and Gray's Landing," stopping right under King's balcony, even though there were no protesters near King. *Id.* at 1217. Meanwhile, Black Hawk helicopters flew overhead as social media influencers documented the deployment of chemical munitions at the Portland ICE facility.

Third, on January 24, 2026, federal officers deployed chemical munitions every hour from 7 p.m. to 11 p.m., resulting in the deployment of no less than 85 chemical munitions, at least one of which struck Gray's Landing. Federal officers deployed the chemical munitions even once the protests had largely dissipated. Meanwhile, gas from the munitions entered Gray's Landing within minutes of each deployment, causing Plaintiff Jane Doe to "cough severely" and sleep in her closet (where she urinated on herself due to

[3] Notably, the events on October 4, 2025, occurred following President Trump's announcement in late September 2025 that he would send the National Guard to Portland.

her fright), Doe's daughter to sleep in the bathtub, and Plaintiff Janice Lineberger to suffer headaches, impaired breathing, and anxiety. *See id.*

Fourth, on January 30, 2026, protesters were simply "standing on the public sidewalk" across the street from the Portland ICE facility, *id.* at 1203, when federal officers walked out of the facility and immediately deployed chemical munitions, including by launching one toward Gray's Landing, in such a manner and quantity that a chemical munitions haze filled the camera screen, making it impossible to see.

Fifth, on January 31, 2026, about 3,000 protesters participated in an organized march that ended at the Portland ICE facility. In the afternoon, federal officers launched chemical munitions from the facility driveway and roof, with one of the chemical munitions shattering a third-story window at Gray's Landing, causing glass to fall on those below. Within minutes, the chemical munitions created a gas cloud so large that it reached a block away from the facility and bordered Gray's Landing. Protesters, including children and the elderly, sought shelter from the chemical munitions in the Gray's Landing lobby to no avail. Indeed, camera footage shows individuals in hallways and elevator banks at Gray's Landing covering their faces and rubbing their eyes due to the gas. In fact, Plaintiff Rebecca Roe called 9-1-1 because she had difficulty breathing in Gray's Landing, and paramedics responding to her call led her outdoors because the gas was worse in the building than outside it. And after exposure to the gas in Gray's Landing on January 31, 2026, Plaintiff Erica del Nigro suffered severe migraines for weeks and a burning rash on her hands, arms, neck and face. Meanwhile, del Nigro's minor son suffered hives across his groin, ankles, and hands.

Sixth, on February 1, 2026, after protesters had already left the Portland ICE facility driveway, federal officers indiscriminately deployed a large number of chemical munitions over a seven-hour period, shooting chemical munitions over crowds of people, and covering large areas extending over a block away from the facility. King was not at Gray's Landing during the chemical munitions deployment and returned to Gray's Landing later in the day. Nonetheless, she found it difficult to swallow (she felt as if she was "swallowing glass"), a symptom which worsened, and she ultimately sought medical attention.

Each of the incidents described above supports the district court's determination that the quantity of chemical munitions used was significant and such use was often indiscriminate and pre-planned.

The government was on notice that its use of chemical munitions harmed Plaintiffs. As the district court noted, first, on July 7, 2025, a Gray's Landing staff member told federal officers outside the Portland ICE facility that the government's use of chemical munitions was poisoning Gray's Landing residents. Yet the staff member testified that the officers simply laughed at her and joked that the chemical munitions are "environmentally friendly," despite the record showing federal officers using gas masks when chemical munitions are deployed. Second, on October 16, 2025, members of Oregon's congressional delegation advised the government in a letter that Plaintiffs were suffering harm because of the government's chemical munitions use. Third, on December 5, 2025, Plaintiffs filed this lawsuit.

Based on these notices, the district court found that "Defendants were specifically notified of the harm that their

widescale deployments of chemical munitions were having on [] Plaintiffs, but Defendants chose to use chemical munitions anyway, often in large quantities." *Id.* at 1210–11. In fact, after Plaintiffs filed declarations documenting the injuries they suffered due to the chemical munitions, the government markedly increased its use of chemical munitions.

The large-scale use of chemical munitions runs contrary to agency use-of-force policies. Federal Protective Service (FPS) Deputy Director Roberto Cantu explained that the FPS is "the primary agency charged with protecting the ICE facility" and its personnel, FPS officers do not use tear gas at all, and FPS officers use other chemical munitions only "in the immediate area and in the nexus area of [the Portland ICE] facility." In fact, Cantu testified that FPS officers have "no business" leaving the immediate vicinity of the facility and would not "employ anything" down either Moody Street or Bancroft Street, the cross streets that run along Gray's Landing and intersect with the Portland ICE facility, "unless there is an immediate threat to a facility or an officer."

U.S. Customs and Border Portal (CBP) officers and U.S. Immigration and Customs Enforcement (ICE) officers, however, may use tear gas and other chemical munitions more broadly than FPS officers. CBP and ICE officers were deployed to the Portland ICE facility to support the FPS. It is undisputed that, in many instances, CBP and ICE officers deployed chemical munitions beyond the immediate vicinity of the Portland ICE facility, including hundreds of feet away from the facility. Chemical munitions were also released immediately outside Gray's Landing, which is about 100 feet away from the Portland ICE facility, and in Gray's Landing, including in the Gray's Landing courtyard.

As the district court pointed out, CBP policy states that officers "may utilize chemical area saturation" when "[r]easonable consideration has been given to any factors which may counsel against the use of such force, such as the presence of . . . small children, the elderly . . . or individuals who lack the ability to quickly disperse from the area," which would include those who live at Gray's Landing, such as Plaintiffs. *Id.* at 1211. The district court's findings of high volume, indiscriminate, months' long use of chemical munitions, despite repeated notice of harm to Plaintiffs, belies any reasonable consideration of the above-referenced factors. And the district court cited ICE's use-of-force policy and found that the government's large-scale use of chemical munitions ran counter to that policy, too.

The government nonetheless argues that the district court erroneously relied on Cantu's testimony regarding when and where FPS officers can use chemical munitions rather than evidence regarding when and where CBP and ICE officers can use chemical munitions. As discussed above, this is inaccurate as the district court considered such evidence. Moreover, FPS is charged with protecting the Portland ICE facility. If FPS generally deems the use of chemical munitions outside the immediate area of the Portland ICE facility as unnecessary to fulfill its mission, it is unclear why CBP and ICE officers—whose mission, as part of their deployment to the Portland ICE facility, is ostensibly the same as FPS—would need to use chemical munitions in a manner different than FPS.

In sum, Plaintiffs submitted a tremendous amount of evidence to support their claim of deliberate indifference. The evidence shows, as the district court found, that the government's use of chemical munitions was often widespread, repeated, planned, and indiscriminate, and

caused harm to Plaintiffs, which the government knew. *See Polanco v. Diaz*, 76 F.4th 918, 928 (9th Cir. 2023) (concluding that the plaintiffs' allegations satisfied the deliberate indifference requirement in part because Defendants "did not attempt to mitigate the risk" of COVID-19 during a prison transfer, despite awareness that their COVID-19 policies were inadequate). The government nonetheless relies on cases where officers acted in haste and without the opportunity for deliberation. *See Whitley v. Albers*, 475 U.S. 312 (1986); *Puente v. City of Phoenix*, 123 F.4th 1035 (9th Cir. 2024). Those cases are inapposite here, as "[t]he presence of some violent actors did not give [the government] *carte blanche* to fire crowd control weapons indiscriminately into crowds of peaceful protesters, legal observers, and members of the press." *L.A. Press Club v. Noem*, 171 F.4th 1179, 1189 (9th Cir. 2026). The district court acknowledged that "many incidents that officers faced required them to act decisively" but explained that this case "challenges the large-scale, repeated deployment of chemical munitions that infiltrate the Gray's Landing apartments and affect the [ ] Plaintiffs who live there, particularly in moments where there was ample time to deliberate before deploying chemical munitions." *Reach Cmty. Dev.*, 822 F. Supp. 3d at 1214–15 (citation modified).

Ultimately, the government had "extended opportunities to do better" and instead demonstrated a "protracted failure even to care." *Lewis*, 523 U.S. at 853. This "indifference is truly shocking." *Id.* The government's apparent deployment of chemical munitions for the purpose of social media content creation is particularly shocking.

* * *

For the reasons above, I respectfully dissent.